[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 30, 2004
THOMAS  K. KAHN
CLERK

No. 02-15462

D.C. Docket No. 02-00046 CR-3-RV

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KEVIN W. GRAY,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Florida

**(April 30, 2004)**

Before TJOFLAT, BARKETT and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

On September 17, 2002, a jury found Kevin Gray guilty of mail fraud, in violation of 18 U.S.C. § 1341.[1] He now appeals his conviction and sentence. First, he seeks a judgment of acquittal on the ground that his fraudulent scheme was "so absurd" that a person of ordinary prudence would not have believed it; the scheme therefore lies outside the realm of conduct proscribed by the mail fraud statute. Alternatively, he seeks a new trial on the ground that the district court erred in instructing the jury on the elements of mail fraud.[2] He also challenges his sentence on the ground that the court took an uncounselled prior conviction into

---

[1] In its entirety, 18 U.S.C. § 1341 reads:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

[2] As an additional ground for a new trial, Gray cites the court reporter's failure to transcribe verbatim two tape-recorded conversations between Patti and the appellant that were introduced into evidence and played before the jury. Because this ground is frivolous, we make no further mention of it.

account in fashioning his sentence. For the reasons that follow, we affirm the appellant's conviction and sentence.

I.

The appellant's current predicament can only be understood against the backdrop of the event – the criminal prosecution of a prominent businessman in Pensacola, Florida – that led him to initiate the scheme to defraud for which he was convicted.[3] In May, 2000, a Northern District of Florida grand jury indicted Frank M. Patti, Sr., a prominent Pensacola, Florida businessman, on eight counts for filing false income tax returns for himself and one of his companies, Patti Shipyard, Inc., for the tax years 1993, 1994, 1995 and 1996. In February, 2001, the grand jury returned a superceding indictment, adding four more counts charging Patti with filing false tax returns for himself and the shipyard. Ten months later, in December, 2001, the grand jury returned yet another superceding indictment; it contained twelve additional counts for a total of twenty-four. Count thirteen charged Patti, the president of Joe Patti Seafood, Inc., and Alice Guy, the company's manager, with conspiring from 1994 through 1998 to withhold the

---

[3] Because the appellant claims that the evidence was insufficient to establish mail fraud and, thus, that he is entitled to a judgment of acquittal, we review the evidence in the light most favorable to the Government. United States v. Hansen, 262 F.3d 1217, 1236 (11th Cir. 2001). We have viewed the evidence in that light in reciting, in Part I, the salient facts.

payroll taxes due with respect to the company's employees. Counts fourteen through twenty-four charged Patti and Guy with the substantive failing to withhold offenses that were the objects of the count thirteen conspiracy.

As the federal government closed in on Patti, he took steps to gain sympathy for his side of the case. He professed his innocence to members of the press, and they reported what he said. This publicity, in turn, exposed him to unsavory characters who sought to exploit his legal woes for pecuniary gain.[4] Enter the appellant, who devised a scheme to bait Patti into forking over $185,000.00 in exchange for not being sent to prison.

On January 2, 2002, the district court entered an order scheduling Patti's trial for April 15, 2002. On Thursday, April 4, eleven days before the trial was to begin, Patti received a FedEx letter delivered to his seafood restaurant in Pensacola. The letter read:

FP., Your current predicament has been brought to our attention by a mutual friend & colleague   Your files from Memphis, Butner,[5] Pensacola & Tallahassee have been reviewed by our associates   This case against you

---

[4] At the appellant's trial, Patti, testifying as a prosecution witness, said that he received literally hundreds of "nut letters" while his case was pending in the district court.

[5] Following his indictment, the question arose as to whether Patti was competent to stand trial. To determine his competence, the district court had him examined at the Federal Medical Center in Butner, North Carolina.

and AG[6] gives the government an 80/20 favorable conviction   Our mutual friend is concerned for your well being and has asked us to intervene   This is not a prank but real serious business & it is imperative you believe in the contents of this letter & follow the advice & directions given   Do not discuss this info with anyone including AG & Comisky[7]   You are a deep pocket figure to him only & he is a liability to all involved   We can assure you & AG of no imprisonment but you must pay the agreed tax settlement issued by the court   You are facing a long incarceration stay & Collier, Davies & Hensel[8] are using you to inhance [sic] their career [sic]   If you wish to continue with our help follow these directions step by step   Insert the words . . . YES WE HAVE . . . in front of the words SHRIMP, OYSTER & CATFISH on your digital flashing sign out front of Joe Patti's   This will allow our associates in Pensacola to inform us of your intentions . . .   The pay phone on the corner of Main & Palafox will ring Saturday 4-06-02 at 2:10 & again at 2:10 Sunday  The phone is located in front of The Daily Grind Café  You must answer the phone by saying . . .  Hello this is Jack

---

[6] In the letter, A.G. refers to Patti's co-defendant, Alice Guy.

[7] Ian Comisky was Patti's defense counsel.

[8] Collier was the presiding judge in Patti's case, while Davies and Hensel were the prosecutors bringing the case against Patti.

Simmons . . . You will use this name for future conversation   Do not ask questions just follow the directions given   Do not bring any recording devices just a pen & paper  You will be observed at all times  Your future rest [sic] in your hands & many people have risk [sic] political & military careers to assist you  The importance of extreme silence is essential

Good luck

HWH

This letter, which evinced a concrete level of knowledge with respect to the parties involved in Patti's legal predicament, represented a "ray of hope" for the businessman who was facing the prospect of prison sentences totaling ninety-six years.[9]  Thus, the following Saturday, April 6, he went to the pay phone by the designated café.  There, he received the expected phone call shortly after 2 p.m.; the caller asked him if he was, in fact, "Jack Simmons."  After Patti acknowledged that he was, the caller instructed him to return to his truck and await a second call at the pay phone.  The call never came.  When he returned to his place of business, however, he received another call from the same unknown person, again asking

---

[9] Patti testified that the letter represented a "ray of hope" in an otherwise desperate situation for him.

him if he was "Jack Simmons." This time, the caller reiterated what he had written in his letter to Patti and added that United States Senator Jesse Helms,[10] some congressmen, and a five-star general were inclined to help emancipate Patti from his legal troubles.

After dangling the promise of political leverage, the caller instructed Patti to package $120,000 in six bags and to write down a series of numbers and letters signifying the amounts of that money intended to go to specific jurors.[11] In exchange for the money, the caller promised Patti that he would serve no jail time. However, the caller's disclosure to Patti that some of the money would be used to bribe jurors alerted Patti that there was something suspicious about the caller's intentions. As Patti testified at the appellant's trial, "When J-1 came out of the phone I knew this was nothing but extortion, and I listened on. I didn't hang up. I was – I didn't believe in that. And he told me what was–what to do, and I knew this was just – this – this was just baloney."[12]

---

[10] At the appellant's trial, Patti testified that the caller's mentioning of Senator Helms, who represented the state of North Carolina in the U.S. Senate from 1972 to 2002, seemed to authenticate the validity of the letter he had received; the letter had been sent from Clyde, North Carolina, and Patti had some connections to the state.

[11] J-1 (Juror 1) was earmarked for $35,000; J-2 – $25,000; J-3 – $25,000. Patti was also told that "S" would receive $20,000; another "S" would receive $5,000, and "P" would have to be given $10,000.

[12] Patti intimated that the caller's plan to bribe jurors tipped him off to the fraudulent nature of the scheme because he believed it was impossible to bribe jurors.

Shortly after this realization, Patti contacted his attorney, Ian Comisky, who in turn informed federal authorities of what was occurring. They told Patti to take the caller's bait and that the FBI would tape any phone calls he received from the caller. Growing bold at the prospect of receiving $185,000[13] in cash, the caller repeatedly contacted Patti by telephone. He even solicited payments from Patti after Patti entered into a plea agreement with the Government and pled guilty to counts eight and thirteen of the indictment. Eventually, the FBI determined that the calls had been made to Patti from a pay phone at 605 W. Garden Street in Pensacola. The appellant was apprehended at that location on the night of April 11, while he was on the phone with Patti.[14]

On May 8, 2002, a federal grand jury in the Northern District of Florida

---

Q: And you knew it was a baloney and a hoax, because –
A: You don't bribe jurors.
Q: You knew that that was unreasonable even to say something like that?
A: It's impossible.
Q: Impossible to bribe a juror?
A: I would think so.
Q: Okay? Is that what you thought?
A: Yes, sir.

[13] In one of their phone conversations, the appellant told Patti that in addition to the $120,000 he would have to pay in the pre-trial phase, Patti would have to pay an extra $65,000 after the trial began.

[14] An FBI agent listening on the other end of the phone testified that the phone conversation lasted roughly five to ten minutes before it ended abruptly. He was informed shortly after that the appellant had been taken into custody.

returned an indictment charging the appellant on one count of mail fraud. He pled not guilty, and the case proceeded to trial before a jury. The jury, having received evidence establishing the facts set forth above, found the appellant guilty, and the district court sentenced him to prison for twenty-eight months. This appeal followed.

## II.

## A.

The appellant's initial attack on his conviction is that the evidence was insufficient to make out a case of mail fraud. He bases this attack on United States v. Brown, 79 F.3d 1550 (11th Cir. 1996). There, we said that to prove the crime of mail fraud, the Government must establish that the defendant "intended to create a scheme 'reasonably calculated to deceive persons of ordinary prudence and comprehension.'" Id. at 1557 (citation omitted). Additionally, it must show that the defendant took some action in furtherance of his scheme – to bring it to fruition – in the form of a material misrepresentation made to the would-be victim that "a reasonable person would have acted on." Id.[15] It is on this peg that the

---

[15] Presumably, that a reasonable person would have acted on the defendant's representation is some evidence of the defendant's intent to defraud. Said another way, if a reasonable person would not have acted on the representation, a finding that the defendant made the representation with the intent to defraud would be problematic.

appellant hangs his hat, contending that a reasonable person would not have acted on his representations when considered as a whole. In bolstering his argument, he draws attention to his statement to Patti that $85,000 would be needed to bribe three of the jurors who would be trying his case: $35,000 for J-1, and $25,000 each for J-2 and J-3.[16] The appellant contends that a reasonable person would know that since the pool from which these jurors would be selected would not be known until April 15 – when the pool assembled at the courthouse for the trial – the representation had to be phony.

While it is true that statements like the one he cites would seem absurd or fanciful to a reasonable person, the mail fraud statute does not require that every representation a defendant utters while executing his scheme must be credible. Instead, the statute requires proof that the defendant's scheme to defraud involved the use of material, false representations or promises. See 18 U.S.C. § 1341 ("[w]hoever ... having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false pretenses, representations, or promises. . . shall be fined under this title or imprisoned not

---

[16] As recited in the text supra, at Part I, one of the appellant's representations to Patti was that Senator Helms and a five-star general were willing to help him out. Although in his brief to us the appellant does not label this representation as absurd, we assume that he would place it in the same category as the payments to jurors 1, 2 and 3.

more than 20 years, or both."). The initial representations the appellant made to Patti – those in the FedEx letter – satisfy this requirement.

In the letter, the appellant made a false promise: "[w]e can assure you. . . no imprisonment but you must pay the agreed tax settlement issued by the court." In addition, he falsely represented that an undisclosed number of sympathizers – including "[o]ur mutual friend" and "our associates in Pensacola" – would work to extricate Patti from his legal predicament if the businessman would agree to follow certain instructions. True, the letter did not identify precisely how the writer and these sympathizers would help Patti, but this omission did not render the letter devoid of any material misrepresentations that were capable of prompting a reasonable person to act as Patti did.[17] What the appellant overlooks

---

[17] Although in his brief, Gray never makes the claim that the letter sent to Patti was itself absurd (indeed he admits that the letter gave Patti "a glimmer of hope" when he first received it and states that the "letter alone" may have satisfied Brown's objective standard), the dissent appears to contend that because the letter was shrouded in anonymity and instructed Patti to resort to cloak and dagger activities to communicate whether he was interested in contacting the source of the letter, a reasonable person would not have acted on the letter. We disagree with this premise. After all, it is well known that secrecy, anonymity, and concealment are a leitmotif in plans and conspiracies to engage in criminal activity. See, e.g., United States v. Netterville, 553 F.2d 903, 909 (5th Cir. 1977) ("a conspiracy by its very nature is born and clothed in secrecy.") (citations omitted). For this reason, the observations made by the dissent, e.g., stressing that the letter advised Patti to "not discuss this info with anyone" and that it "require[s] Patti to assume a code name" and "communicate secret messages" far from rendering the letter unbelievable in this case, add to its plausibility as a communication contemplating the possibility of extricating Patti from his legal predicament through clandestine means. At any rate, such factually intensive issues over which reasonable minds can disagree seem best left in the province of the jury. See Bryan v. Jones, 530 F.2d 1210, 1218 (5th Cir. 1976) (Wisdom, J., concurring in part and dissenting in part) ("reasonableness is basically a jury question; it is a

is that the mail fraud statute "punish[es] unexecuted, as well as executed, schemes. This means that the government can convict a person for mail . . . fraud even if his targeted victim never encountered the deception – or, if he encountered it, was not deceived." Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir. 1991) (citations omitted).  All that the Government needs to show to establish the mens rea element of the offense is that the defendant anticipated the intended victim's reliance, and the appellant's anticipation of Patti's reliance can be inferred from, among other things, the fact that he was prepared to call Patti at the pay phone at the time and location specified in the letter.  See id. at 1503.

Because the letter received by Patti contained false, material representations from the appellant as part of an effort to receive cash payments from the desperate businessman, the crime of mail fraud was complete when the appellant delivered the letter via FedEx to Patti.  See United States v. Crossley, 224 F.3d 847, 859 (6th Cir. 2000) ("the offense of mail fraud is completed and the statute of limitations begins to run on the date on which the defendant, depending on the specific use of the mails charged in the indictment, 'places,' 'deposits,' 'causes to be deposited,' 'takes,' or 'receives' mail, or 'knowingly causes' mail 'to be delivered' as part of the execution of a scheme to defraud."); United States v. Kennedy, 64 F.3d 1465,

concept that loses meaning when courts try to pin it down.").

12

1478 (10th Cir. 1995) ("The 'completion' of both wire and mail fraud occurs when any wiring or mailing is used in execution of a scheme; there is no requirement that the scheme actually defraud a victim into investing money for the crime to be complete."); United States v. Hickey, 16 F. Supp. 2d 223, 234 (E.D.N.Y. 1998) ("the crime [of mail fraud] is complete upon the hatching of the scheme with the requisite intent supplemented by the use of the mails."). That the appellant subsequently shot himself in the foot by explaining to Patti during one of their phone conversations that the money he sought would be used to bribe jury members does not retrospectively render his illegal conduct non-illegal. Indeed, it is worth noting that our precedent in this circuit establishes that the appellant could have been convicted for his scheme even if Patti had not received the letter. See Kreuter v. United States, 218 F.2d 532, 535 (5th Cir. 1955) ("Success of the scheme is not essential to completion of the offense and it is not necessary to prove communication of the alleged false representations to the victims."); Pelletier, 921 F.2d at 1498 (same). Accordingly, it is clear that a phone conversation taking place after the mailing does not shield the appellant from criminal liability under the mail fraud statute.

We also note that this case is distinguishable from Brown because, unlike the claims made by the Brown defendants, the appellant's nebulous

13

representations to Patti (promising to interfere illegally with a federal prosecution) did not lend themselves to easy verification when Patti received the mailing precisely because the false promises that were made concerned illegal activity.[18] Because the fraudulent promise in this situation encompassed illegal activity which by its nature tends to operate by clandestine means, Patti could not easily verify or investigate the accuracy of the appellant's representations "by a telephone call or a visit . . . to a competitor, or by a look at newspaper classified ads." Cf., Brown, 79 F.3d at 1559. In other words, there was no information readily accessible in the public domain which Patti could immediately obtain to confirm or disprove the letter's representations. Cf. Assoc. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co., 941 F.2d 561 (7th Cir. 1991) (no scheme

---

[18] We also are troubled with the dissent's suggestion that "a scheme that depends on a person's willingness to bribe a jury is, in most instances, not a 'scheme reasonably calculated to deceive persons of ordinary prudence" because it involves "transcending the bounds of ethics and morality" and a "greater risk" of criminal sanctions. First, it should be noted that risk-aversion and reasonableness are not necessarily the same thing: a reasonable people may decide to take a risk whenever his or her unique risk-utility calculus leads him or her to believe the potential gain is worth the hazard. To confuse reasonable behavior for risk-preferences could have troubling implications in myriad, mail fraud situations, e.g., would liability attach in a Ponzi-scam operation where only reasonable people, albeit reasonable people with a certain tolerance for risk would be swayed while reasonable people who are more risk averse would stay away? Second, we note that a holding that most schemes contemplating criminal or immoral behavior are not reasonably calculated to deceive persons of ordinary prudence would lead to the following bizarre result: individuals who make fraudulent promises to engage in criminal activities for the benefit of another in exchange for money are shielded from liability under the mail fraud statutes while only false promises to engage in legal, moral, and ethical activities can be penalized. Surely, the framers of the mail fraud statute contemplated no such result.

14

to defraud where "[t]he relation between the rates offered . . . and those available on other investments can be checked by a quick look at the <u>Wall Street Journal</u> or the <u>Chicago Tribune)</u>; <u>Blount Fin. Serv. v. Walter E. Heller & Co.</u>, 819 F.2d 151 (6th Cir. 1987) (no scheme to defraud where reliance on the defendants' statement was unreasonable because the fraudulent representations could have been contradicted by information accessible to the alleged victim).  Accordingly, this case is distinguishable from <u>Brown</u> on many levels, and the notion that the appellant was somehow entitled to a judgment of acquittal fails.

B.

The appellant next contends that the district court erred when, in charging the jury, it provided the jury with two inaccurate statements of the law.  Whether a district court's instruction mis-characterized the law or misled the jury to the prejudice of the defendant presents a question of law that is subject to <u>de</u> <u>novo</u> review.  <u>United States v. Deleveaux</u>, 205 F.3d 1292, 1296 (11th Cir. 2000).

The relevant portion of the jury instruction challenged by the appellant reads as follows:

> A statement or representation is false or fraudulent if it relates to a material fact and is known to be untrue or is made with reckless indifference as to its truth or falsity and is made or caused to be made with intent to defraud.  A statement or . . . representation may also be false or fraudulent when it constitutes a half truth or effectively conceals a material fact, provided it is

15

made with intent to defraud.

A fact is material if it has a natural tendency to influence or is capable of influencing the decision of the person or entity to whom or to which it is addressed. A false or fraudulent statement, representation or promise can be material even if the decision maker did not actually rely on the statement or even if the decision maker actually knew or should have known that the statement was false.

To prove a fraud crime the government must show that the defendant under consideration intended to devise or participate in a scheme reasonably calculated to deceive a person of ordinary prudence and comprehension under the same circumstances. The person of ordinary prudence standard is an objective standard and is not directly related to the level of knowledge and experience of any specific person. For purposes of this offense the government must prove that a reasonable person of average prudence and comprehension under the same circumstances would have acted on the representation made by the defendant.

According to the appellant, the court got off track when it instructed the jury on the definition of a "material" fact. Specifically, he contends that the instruction improperly stated that "[a] false or fraudulent statement, representation or promise can be material even if the decision maker did not actually rely on the statement or even if the decision maker actually knew or should have known that the statement was false." We find no merit in this contention because the district court's language is a correct statement of law and mirrors the language this court crafted in United States v. Neder, 197 F.3d 1122, 1128 (11th Cir. 1999).

The appellant next challenges the district court's instruction to the jury not

16

just "to look at a person of ordinary prudence, as <u>Brown</u> instructed, but to look at a person of ordinary prudence in the peculiar situation facing Mr. Patti." The portion of the charge at issue reads, "For purposes of this offense the government must prove that a reasonable person of average prudence and comprehension **under the same circumstances** would have acted on the representation made by the defendant." (emphasis added). The appellant contends that this instruction is problematic because by advising the jury to consider the "same circumstances" faced by the victim of the fraud, the court implicitly rejected the dictates of <u>Brown</u>, where we said that "[t]he 'person of ordinary prudence' standard is an **objective standard** not directly tied to the experiences of a specific person or persons." 79 F.3d at 1557. (emphasis in original). We disagree with the appellant's characterization of the district court's instruction.

First, we note that the district court correctly included in its instructions to the jury that "[t]he person of ordinary pruden[ce] standard is an objective standard and is not directly related to the level of knowledge and experience of any specific person." This correct statement of the law militates against the error the court supposedly committed. Second, we note that while some inconsistency may be found between this part of the instruction and the "under the same circumstances" language found elsewhere, the appellant can hardly claim unfair prejudice in this

17

instance because the Government was entitled to go into Patti's circumstances to the extent necessary to prove that the appellant had the statutorily required mens rea, or intent, to deceive and defraud Patti. The Government has the prerogative, if not the duty, to inform the jury of the would-be victim's (in this instance Patti's) circumstances, as seen through the mind of the defendant, to help enable the jury to determine whether the defendant had the requisite intent to defraud his selected victim(s). Similarly, the jury was required to consider Patti's circumstances in deciding whether the materiality element of the mail fraud statute was met.[19] Accordingly, it was not improper for the jury to consider Patti's circumstances in making its final determination as to the appellant's guilt.

Finally, it is worth observing that as a practical matter, even the objective, reasonable person of ordinary prudence standard must be anchored in reality and connected to the material circumstances surrounding the victim or the intended

---

[19] In Neder v. United States, 527 U.S. 1, 25, 119 S. Ct. 1827, 1841, 144 L. Ed. 2d 35 (1999), the Supreme Court determined that materiality was an element the Government has to establish to support a conviction under the mail and wire fraud statutes. The Court further instructed that "a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" Id. at 15, 119 S. Ct. at 1837 (citations omitted). In this case, for the jury to determine whether Gray's representations had a natural tendency to influence Patti's decisionmaking, it was necessary for them to consider the circumstances the addressee found himself in because a person not facing criminal prosecution would not tend to be influenced by a statement offering to help him avoid serving time in prison.

victim of a scheme to defraud if it is to serve a useful function in guiding a jury's deliberations. Stated differently, if a jury could not take into account the material circumstances surrounding a scheme to defraud, almost no mail fraud conviction could be upheld in cases where the victim faced a "peculiar situation" far removed from the circumstances with which most people of ordinary prudence are generally familiar, and where, as in the instant case, the defendant tailored his scheme to defraud that particular individual because of the unique circumstances confronting the victim.[20] We do not see <u>Brown</u> as extending so far as to require an instruction that a jury may not consider the targeted victim's circumstances although those circumstances are relevant to establishing whether the defendant had the requisite intent to defraud the victim. Therefore, because there was no evidence that the jury was instructed to consider improper factors, and bearing in mind the practical considerations we acknowledge above, the appellant's claim of error in the jury instruction is denied.

## C.

---

[20] For example, a scheme to defraud the mother of a missing child by falsely promising to return the child in exchange for money would be credible only to a mother missing a child. Thus, to some extent the peculiar circumstances surrounding a particular victim – in this case Patti's exposure to criminal tax charges – have to be considered by the jury. Otherwise fraudulent schemes aimed at people who find themselves in extraordinary situations would always lie beyond the purview of the criminal statutes penalizing fraud because the jury could only consider whether a given scheme to defraud would have deceived a person of ordinary prudence and not a reasonable person "under the same circumstances" faced by the fraud victim.

19

As a last measure, the appellant questions the district court's decision to consider his prior convictions (for communicating threats) in determining his criminal history category under the Sentencing Guidelines. See generally U.S.S.G. §4A1.2. In calculating the appellant's criminal history for sentencing purposes, the court's probation office included as part of his criminal history two North Carolina misdemeanor convictions for which the Superior Court of North Carolina had sentenced appellant to 45 days incarceration but suspended the sentence. The inclusion of the North Carolina offenses raised the appellant's Criminal History Category from II to III.[21] He timely objected to the addition of one criminal history point for these offenses and cited Alabama v. Shelton, 535 U.S. 654, 657, 122 S. Ct. 1764, 1767, 152 L. Ed. 2d 888 (2002), contending that because he was not represented by counsel when he was convicted in North Carolina, it would be error to include those offenses in calculating his criminal history. We find that the district court did not misapply the sentencing guidelines.

In Shelton, the Court stated that an indigent defendant who receives a suspended or probated sentence to imprisonment has a constitutional right to counsel. This holding in effect acknowledged that indigents are entitled to

---

[21] Had the court used Criminal History Category II, the sentence range would have been 24-30 months' imprisonment. Criminal History Category III yielded a range of 27-33 months. The court sentenced the appellant to 28 months' imprisonment.

appointed counsel "in any misdemeanor case that 'actually leads to imprisonment.'" Shelton, 535 U.S. at 661, 122 S. Ct. at 1769 (citing Argersinger v. Hamlin, 407 U.S. 25, 33, 92 S. Ct. 2006, 2010, 32 L. Ed. 2d. 530 (1972)). As the district court noted, however, the North Carolina court specifically found that the appellant was not indigent and therefore did not qualify for the appointment of counsel.[22] Thus, it was left to him to determine whether he wanted to hire his own attorney or represent himself, and, as the district court correctly noted, the North Carolina court's record conclusively established that on November 18, 1996, the appellant executed a waiver of counsel and then chose to enter a guilty plea to the offenses. Because he waived his right to counsel and did not qualify for the appointment of counsel, Shelton does not apply here.

In the wake of these findings, the district court could not have discounted the appellant's prior conviction in North Carolina absent a showing that his waiver of counsel was somehow flawed or that the North Carolina court erroneously refused to designate him as indigent. See United States v. Phillips, 120 F.3d 227, 231 (11th Cir. 1997) ("The result is that in sentencing a defendant a district court

---

[22] The appellant completed an "Affidavit of Indigency for Superior Court" on January 6, 1997. Court documentation indicates that the court denied the appellant's request for court appointed counsel after finding him financially able to provide the necessary expenses of legal representation.

21

cannot ignore or discount for any purpose a prior conviction that has not been invalidated in a prior proceeding, unless there was an unwaived absence of counsel in the proceedings resulting in that conviction."). The evidence presented to the district court does not suggest that the appellant's waiver of counsel in the North Carolina court was invalid. His sentence therefore stands.

AFFIRMED.

BARKETT, Circuit Judge, dissenting:

I respectfully dissent, finding the majority opinion in conflict with United States v. Brown, 79 F.3d 1550 (11th Cir. 1996).[1]  Brown holds that "[t]o prove a crime [of mail fraud], the government must show the defendant intended to create a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension."  Id. at 1557 (emphasis added)(internal citation omitted).  I cannot accept that the scheme or representations in this case could be "reasonably calculated to deceive persons of ordinary prudence and comprehension."

We found in Brown that agents of a large real estate developer who made material misrepresentations in an attempt to lure costumers from snow-belt states into buying overpriced homes were not guilty of mail-fraud because "reasonable jurors could not find that a person of ordinary prudence, about to enter into an agreement to purchase a. . . home in Florida, would rely on . . . the seller's own affirmative representations about the value or rental income of the . . . homes."  79 F.3d at 1559.

I find it impossible to reconcile how a prudent person would not rely on a large developer's official-looking but false or misleading real-estate appraisals; but

---

[1] Whether or not we agree with this Court's decision in Brown, we are bound by it.  United States v. Hogan, 986 F.2d 1364, 1369 (11th Cir.1993) ("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court.").

that a prudent person (albeit, this time facing serious criminal charges) would rely on the anonymous communications in this case.

The majority asserts that the crime was complete at the time of the first communication, in which the anonymous author misrepresented that "we can assure you . . . no imprisonment" and that certain mutual friends were willing to aid Patti in this respect. However, the letter containing that communication reeked of unreliability: the letter requires that Patti not tell anyone about the communication ("[d]o not discuss this info with anyone, including [with your associate and lawyer]");  the letter requires Patti to assume a code name ("[y]ou must answer the phone by saying hello, this is Jack Simmons"); it requires that he should communicate secret messages ("[i]nsert the words ... yes, we have ... in front of the words shrimp, oysters and catfish on your flashing sign out front of Joe Patti's"); it guarantees the result in a criminal case, irregardless of guilt ("[w]e can assure you and A.G. of no imprisonment, but you must pay the agreed tax settlement issued by the court."); and it is anonymous.  No doubt the unbelievable nature of the communication motivated the author to self-consciously assert that "[t]his is not a prank but real serious business."

If "reasonable jurors could not find that a person of ordinary prudence, about to enter into an agreement to purchase a. . . home in Florida, would rely on .

24

. . the seller's own affirmative representations about the value" of the properties at issue in <u>Brown</u>, how can it possibly be said that a reasonable juror could find that a person of ordinary prudence would act on this shady and ridiculous anonymous communication?

Because the initial letter was not designed to deceive a person of ordinary prudence, I do not believe the crime of mail fraud was completed by the mailing of that communication. Subsequent communications similarly failed to lend any credibility to the scheme. Indeed, the first conversation Patti had with Gray quickly dispelled any notion Patti had that the representations were genuine;[2] just as it would have dispelled any hint of reliability for a reasonable person. The caller created a fantastic conspiracy theory complete with mysterious five-star generals and famous senators.[3]

---

[2]Patti testified: "I didn't believe anything he told me after the J-1, J-2, and J-3."

[3]Moreover, in my mind, a scheme that depends on a person's willingness to bribe a jury is, in most instances, not a "scheme reasonably calculated to deceive persons of ordinary prudence." <u>Id.</u> at 1557. Besides transcending the bounds of ethics and morality, a person who would bribe a jury exposes herself to greater risk and criminal sanctions. Furthermore, because illegal contracts cannot be enforced by law, a person that gives consideration for such a contract must do so with full knowledge that no legal remedy exists if the other party breaches. It is hardly believable that a prudent person would rely on an invitation to commit a crime without knowing who was behind the invitation.

Despite the majority's assertions to the contrary, the amount of risk involved is central to a determination of whether a reasonably <u>prudent</u> person would participate in the proposed transaction. <u>See Majority Opinion</u>, Note 18. Indeed, "prudence" is defined as "attentiveness to possible hazard or disadvantage" and "prudent" is synonymous with "cautious." Webster's Third New International Dictionary 1828 (1993). Furthermore, risk-aversion is intimately related with

I therefore respectfully dissent.

---

"reasonableness."  See, e.g., Bourg v. Texaco Oil Co. Inc., 578 F.2d 1117, 1121 (5th Cir. 1978)(approving trial court's jury instruction that stated: "A prime consideration in determining reasonableness is the possible risk in the particular situation. Naturally, the greater the risk of danger in any given situation, the greater the caution that will be exercised by the reasonably prudent person. That is, as the risk of danger increases, the reasonably prudent person exercises more and more care."(emphasis added)).

The "bizarre result" the majority fears is really an expression of dissatisfaction with our holding in Brown that a mail fraud scheme must be calculated to deceive "persons of ordinary prudence."  Once again, whether or not we believe this should be the rule, we are nevertheless bound by it.