[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 21, 2010
JOHN LEY
CLERK

_____

No. 08-17222

_____

D.C. Docket No. 07-80123-CR-KAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VIOLETTE GAIL ELDRIDGE,
PAUL D. KUHN,
KATHERINE CRASE,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 21, 2010)

Before CARNES, ANDERSON and STAHL,[*] Circuit Judges.

STAHL, Circuit Judge.

Defendants-appellants Violette Gail Eldridge, Paul D. Kuhn, and Katherine Crase were tried and convicted of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, and mail fraud,[1] in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2. On appeal, they primarily argue that the FBI investigation that resulted in their prosecution and conviction amounted to outrageous government conduct and that sufficient evidence does not support their convictions. Having carefully considered the record, we affirm on both issue as to all three appellants. We also affirm as to several subsidiary issues raised by the various appellants, including the district court's jury instructions, estimation of the amount of loss, and sentencing.

## I. Background

We recite the facts of the case in the light most favorable to the government. See United States v. Gray, 367 F.3d 1263, 1266 n.3 (11th Cir. 2004). In 2003, the FBI began an undercover investigation upon receiving a tip from a

---

[*] Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by designation.

[1] Eldridge and Crase were convicted of six counts of mail fraud, while Kuhn was convicted of one count of mail fraud and acquitted on the remaining five counts. Eldridge and Crase were sentenced to 30 months' imprisonment while Kuhn received a 24-month sentence.

cooperating witness that Eldridge was involved in fraudulent financial dealings. As part of the investigation, an FBI agent posed as a hedge fund manager named John Firo[2] and met with Eldridge and Crase several times during 2003, proposing to create fraudulent hedge fund statements for a financial entity that the two women were in the process of creating. They declined involvement in the scheme.

In February 2004, Firo again approached Eldridge and Crase, telling them he was advising a potential investor who was seeking to invest $750,000 with a financial entity that would enable him to avoid paying taxes on the investment amount. This supposed wealthy investor was in fact another FBI agent using the alias Grant Colvin. Firo told Eldridge and Crase that in return for delivering the investor, he expected to receive a kickback payment out of the money invested by Colvin. Crase replied that such a payment would not be a problem, whether or not the investor knew about the arrangement.

Firo met with Crase the next month, in March 2004, to discuss Colvin's investment further; Eldridge participated in the discussion over the telephone. At the meeting, the kickback was discussed again, with Firo emphasizing that the potential investor could not know about the kickback; Eldridge and Crase assured him that the investor would not know of the arrangement. Eldridge and Crase also told Firo that

---

[2]This opinion will refer to the FBI agents using their aliases.

3

they would prepare a private placement package for the investor that would promise a minimum annual return of ten percent.[3] Later that same month, Firo confirmed in a phone call with Crase that his kickback would amount to 30 percent of Colvin's initial investment.

Also in March, Firo told Eldridge and Crase that his investor, Colvin, was ready to meet with them to discuss the potential deal. Crase decided to bring in a third person, Paul D. Kuhn, to pitch the investment to Colvin in exchange for a financial payment of some sort. For the pitch meeting, Kuhn secured the use of the office of a Florida state representative with whom he had a personal relationship. As it turned out, that use was not authorized by the representative.

On April 13, 2004, Firo, Crase, and Kuhn held a planning meeting in order to rehearse for the pitch meeting, which was to be held the next day. During the planning meeting, Firo informed Kuhn that Colvin did not know that Firo stood to gain anything from the deal, and Kuhn agreed to conceal that fact from Colvin. Kuhn and Firo also rehearsed pretending to meet each other for the first time so that the investor would not know that Firo was involved in the deal. Also, Crase and Kuhn

---

[3]Eldridge and Crase also told Firo that the investor would not be informed of Eldridge's involvement in the investment entity because Eldridge was then the subject of an SEC action regarding other alleged financial misconduct. Indeed, though Eldridge apparently drafted the proposed investment agreement and was to have been primarily responsible for the financial management of the funds, her name did not appear on any documents given to the proposed investor, nor did she attend any meetings where the investor was present.

rehearsed ways of pressuring Colvin to invest in the deal, including telling him that other investors had already been approached, that the offering was close to being sold out, and that Colvin might be the last one allowed in on the deal.

At the pitch meeting the following day, Kuhn explained to the potential investor that his political connections allowed the investment team to get in on business opportunities before the general public knew of them. He also explained that the investment would guarantee a ten percent annual return and would be "under the radar," enabling Colvin to avoid paying taxes on his investment amount. Crase told Colvin that the investment would be limited to thirty offers and twenty-five investors and that he was the seventeenth. In reality the investment had apparently only been offered to Colvin and there were never any other investors, real or imagined. Crase also implied that many of her past and current clients had already signed up for the investment. Kuhn confirmed to Colvin that he wasn't "the only guy" involved in the investment and made various other statements regarding other supposed investors. Also, Colvin asked Crase whether Firo had requested a commission and she replied in the negative.

After the meeting, the parties exchanged various documents and signed agreements through the mail, including documents intended to facilitate the payment of the kickback to Firo without running afoul of conflict of interest rules or revealing

the kickback to the investor. Ultimately, Crase decided not to go forward with the investment entity, no money changed hands, and Crase never executed the agreement.

The government indicted the three defendants for conspiracy to commit mail fraud as well as numerous counts of substantive mail fraud. The government's theory at trial was that the three defendants conspired to fraudulently gain access to Colvin's money by making materially false representations and omissions about the investment opportunity.

## II. Discussion

The appellants jointly and, in some cases singularly, present numerous issues on appeal, none of which ultimately need detain us long. We address each in turn below.

## 1. Outrageous Government Conduct

Appellant Crase[4] moved before trial to dismiss the indictment against her for outrageous government conduct. The district court denied the motion.

We review de novo the district court's denial of a motion to dismiss an indictment on outrageous conduct grounds. See United States v. Edenfield, 995 F.2d 197, 200 (11th Cir. 1993). On appeal, Crase posits that she was neither predisposed

___

[4]Though below Eldridge did not make a motion to dismiss based on outrageous government conduct, on appeal Eldridge adopts Crase's argument on this point.

to engage in criminal conduct nor an active participant in the mail fraud conspiracy. Rather, she argues, the FBI agents hounded her, attempting unsuccessfully to lure her into numerous illegal schemes.

However, Crase's actions suggest otherwise. The undercover agents presented Crase with an opportunity to pitch an investment to a fake investor. Crase took that opportunity by, among other things, creating an investment scheme apparently intended solely for this one investor, organizing the pitch (including bringing Kuhn into the deal under the false pretense that he would be in charge of seeking out investment opportunities), making numerous false statements to the investor in order to induce his investment, and agreeing to provide and conceal a kickback to Firo. A review of the transcripts of the planning meeting and the pitch meeting, in particular, convince us that Crase was far from an innocent victim of a government attempt to dupe her into criminal activity. See United States v. Ciszkowski, 492 F.3d 1264, 1270 (11th Cir. 2007) ("Outrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees. Under this standard, the conduct must be so outrageous that it

7

is fundamentally unfair.") (internal citation omitted). We therefore affirm the district court's denial of Crase's motion.[5]

## 2. Sufficiency of the Evidence

All three appellants contest the sufficiency of the evidence on the counts for which they were convicted. We review a sufficiency claim de novo, viewing the evidence "in the light most favorable to the government with all reasonable inferences and credibility choices made in favor of the government." United States v. Campa, 529 F.3d 980, 992 (11th Cir. 2008), cert. denied, 129 S. Ct. 2790 (2009). We are tasked with concluding whether a reasonable jury could have concluded beyond a reasonable doubt that the defendants were guilty of the crimes charged. United States v. Lopez-Ramirez, 68 F.3d 438, 440 (11th Cir. 1995).

Having reviewed the record carefully, we affirm the district court's denial of the defendants' post-judgment motions for acquittal. As a preliminary matter, we reject the argument that acquittal was required because the defendants allegedly did not intend to abscond with Colvin's investment but rather intended to create a legitimate investment vehicle that would provide healthy returns to the investor. The record is replete with evidence that a reasonable jury could have construed to support

---

[5]We would also reject Eldridge's unpreserved argument on the same ground if it were properly before us.

8

the conclusion that the coconspirators' aim was not to create a legitimate investment vehicle but to secure access for personal gain to the large sum of money that Colvin was reportedly interested in investing with them. Particularly given our standard of review, this argument is a non-starter.

Second, the defendants face an extraordinarily high burden in seeking to overturn the verdicts in this case. In order to sustain the convictions on the substantive mail fraud counts, we need only determine that a reasonable jury could have concluded that the defendants used the United States mail system to attempt to carry out a financial scheme involving materially false representations intended to defraud Colvin. See United States v. Svete, 556 F.3d 1157, 1161-62 (11th Cir. 2009); United States v. Ellington, 348 F.3d 984, 990 (11th Cir. 2003). Further, to sustain the conspiracy charge, we need only find that there was enough evidence for a jury to conclude that there was an agreement to devise a mail fraud scheme, that the defendants knowingly participated in the conspiracy, and that they committed one overt act in furtherance thereof. See United States v. Suba, 132 F.3d 662, 672 (11th Cir. 1998). Finally, the defendants in this case must reckon with an extensive record that contains numerous detailed and suggestive transcripts of the meetings and conversations that took place among the defendants and the undercover agents.

Having reviewed those transcripts carefully, we agree with the district court that the evidence was sufficient to support the guilty verdicts as to each defendant. Reading the transcripts in the light most favorable to the verdicts, we easily conclude that a reasonable jury could have determined that defendants Eldridge and Crase made numerous materially false statements intended to fraudulently induce Colvin's investment. A reasonable jury could have read Eldridge's recorded conversations from March 15, 2004 and April 14, 2004, as persuasive evidence that she intended to pressure Colvin into an investment that she knew to be fraudulent. Similarly, Crase's statements at the planning meeting and the pitch meeting were also inculpatory and a reasonable jury could have viewed those statements as indicating unscrupulous financial behavior aimed at using false statements to convince Colvin to invest in a fraudulent investment vehicle.

The evidence against Kuhn is also sufficient to sustain the jury's verdict. While he argued to this court that he was merely the pitchman, brought in for two days to make the pitch, and was otherwise ignorant of the details of the deal, his recorded statements from the planning meeting and the pitch meeting belie that argument. The transcript of the planning meeting reveals that a reasonable jury could have concluded that he had prior knowledge of the fraudulent nature of the deal and that he intended to make material misrepresentations to Colvin at the pitch meeting

10

in order to induce his investment. His behavior the following day at the pitch meeting provided further evidence for a reasonable jury to render a guilty verdict. At the pitch meeting, he did not engage in mere puffing and seller's talk, as alleged, but made materially false representations about the nature of the deal that were intended to induce Colvin's investment.

We therefore affirm as to the sufficiency claims presented by all three defendants.

**3. Jury Instructions**

Crase[6] raises on appeal an argument regarding the jury instructions which was not preserved below. We therefore review the matter for plain error. See Fed. R. Crim. P. 52(b); United States v. Monroe, 353 F.3d 1346, 1349 (11th Cir. 2003) (plain error requires a showing of error that is plain and that affects defendant's substantial rights). Essentially, Crase argues that the jury instruction as to fraudulent omissions was incomplete because it did not state that such omissions constitute fraud only where there is a duty to disclose. She argues that because she allegedly did not have a duty to disclose, her failures to disclose could not have constituted fraudulent omissions. However, we conclude that we need not determine whether a duty to disclose instruction was required because a fair reading of the record reveals

---

[6]Eldridge and Kuhn adopt Crase's jury instruction argument.

numerous instances of fraudulent misrepresentations by Crase, as well as by her co-defendants. The affirmative misrepresentations alone are sufficient grounds upon which to rest the guilty verdicts and we thus discern no plain error in the jury instructions that would have affected defendants' substantial rights.

## 4. Loss Amount

The district court calculated the loss amount to be $225,000, which was equivalent to the 30 percent kickback promised to the undercover agent (in other words, 30 percent of the proposed investment total of $750,000). At sentencing, the government argued that defendants should be held responsible for the total proposed investment amount ($750,000) while the defendants argued for a loss amount of zero because the defendants never accepted any money from the agents. On appeal, Eldridge[7] argues that the loss amount should have been zero because no money changed hands, or, in the alternative, 30 percent of $100,000 because the purported investor eventually proposed transferring a preliminary sum of $100,000 to the defendants.

We review a district court's determination of the amount of loss under the Sentencing Guidelines for clear error. See United States v. Grant, 431 F.3d 760, 762 (11th Cir. 2005). We find no such error here. The district court was quite

---

[7]Kuhn adopts Eldridge's argument on loss amount.

reasonable in choosing an intermediate intended loss amount given that the record supported the conclusion that there was an agreement for a 30 percent kickback and that the defendants anticipated receiving $750,000 from the investor. See United States v. Lee, 427 F.3d 881, 893 (11th Cir. 2005) ("A sentencing court need only make a reasonable estimate of the loss, given the available information.").

**5. Sentencing**

On appeal, Eldridge alone contests the length of her sentence. She argues that the district court's sentence of 30 months in prison was substantively unreasonable due to erroneous consideration of the sentencing factors under 18 U.S.C. § 3553(a). She contends that the court did not adequately consider the alleged outrageous conduct of the government, along with her age and health,[8] and that "the district court should have given greater consideration to a sentence which did not include imprisonment, or that was below the advisory guideline range."

We review the sentence only for reasonableness, United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005), and note that the district court sentenced Eldridge at the low end of the advisory guideline range of 30 to 37 months. We do not find Eldridge's 30-month sentence to be unreasonable, particularly given that the district

---

[8]Eldridge, who is 65-years-old, asserts that she suffers from asthma, heart murmurs, diabetes, diverticulitis, sleep apnea, and chronic kidney infection.

court explicitly considered Eldridge's age and that we have already concluded that the outrageous government conduct argument is meritless.

### III. Conclusion

For the forgoing reasons we **<u>affirm</u>** as to all issues raised on appeal by all defendants.