UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert B. BRUCE et al.,
Defendants-Appellants.

No. 73-1398.

United States Court of Appeals,
Fifth Circuit.

Dec. 18, 1973.

Rehearing Denied Jan. 25, 1974.

Rehearing and Rehearing En Banc
Denied March 18, 1974.

victed these appellants on various counts of securities fraud, 15 U.S.C., § 77q(a), mail fraud, 18 U.S.C., § 1341, sale of unregistered securities in interstate commerce, 15 U.S.C., § 77e(a), and conspiracy to violate the aforesaid statutes, 18 U.S.C., § 371, with individual variations, all counts basically charged the defendants with the unlawful use of the mails in the execution of a fraudulent scheme to sell certain securities.

The appellant, Walker, was convicted on twelve counts and sentenced to serve concurrent terms of three years.

Bruce was convicted on two counts and sentenced to concurrent terms of two years, of which six months must be spent in a penal institution.

Blackwood, an attorney, was convicted on three counts and sentenced to consecutive terms of five years, suspended, with three years probation, as Blackwood was by that time already in prison on other charges.

Except as to Blackwood's conviction on Count 14, which will be reversed, the judgment of the District Court is affirmed.

On appellate review this Court must view the evidence and the reasonable inferences to be drawn therefrom in that light most favorable to the verdict and must determine as a matter of law whether there is substantial evidence, direct or circumstantial, to support the verdict, Glasser v. United States, 315 U. S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Jacobs, 5 Cir., 1971, 451 F.2d 530. In circumstantial evidence cases, the trier of fact must "reasonably find that the evidence excludes every reasonable hypothesis, except that of guilt", United States v. Sidan-Azzam, 5 Cir., 1972, 457 F.2d 1309. If a conviction is attacked on the ground that the evidence was insufficient to support it there will be an affirmance if it is evident that the findings are not clearly erroneous, United States v. Davis, 5 Cir., 1971, 443 F.2d 560, cert. denied, 404 U. S. 945, 90 S.Ct. 298, 30 L.Ed.2d 260 (1971); United States v. Graves, 5 Cir.,

H. A. Stephens, Jr., Atlanta, Ga. (court-appointed), for Bruce.

Charles D. Read, Jr., Decatur, Ga., Gerald M. Birnberg, Houston, Tex., for Walker.

John W. Stokes, U. S. Atty., P. Bruce Kirwan, William P. Gaffney, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before BELL, COLEMAN and RONEY, Circuit Judges.

COLEMAN, Circuit Judge:

Judge Edenfield, of the United States District Court for the Northern District of Georgia, sitting without a jury, con-

1970, 428 F.2d 196, cert. denied, 400 U. S. 960, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970).

In one way or another, each appellant challenges the sufficiency of the evidence.

### The Fraud

The alleged scheme in this case is predicated upon the incorporation and operation of American Capital Corporation [hereafter referred to as American or as the Company]. The defendants were either officers of the Company or professionally retained by it. The list included those responsible for the drawing of the two prospectuses which the prosecution contends were false and misleading. Defendant Walker was the primary incorporator and also the President of American.

On December 13, 1966, American was incorporated in Atlanta, Georgia. To avoid coming within the provisions of the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq., and to aid in the composition of the required prospectus, Walker retained Robert A. Blackwood, an Atlanta attorney. Georgia laws and regulations required the prospectus to contain an elaboration upon the financial condition of the Company by way of certain certified statements. To meet this condition, Walker first approached an accountant with a national accounting firm. After ascertaining what Walker wanted in the financial statement, this accountant turned Walker down because the policy of his firm toward the use of appraisal values in financial statements for newly formed companies would not allow him to do what Walker wanted. [The particular controversy surrounding the use of certain appraisal values will be discussed later.] Walker then contacted Defendant Robert B. Bruce, at the time a C.P. A. in Florida, who agreed to do the necessary accounting work. The first prospectus was offered to the public on January 31, 1967.

As a means of obtaining capital funding, the Company offered two types of securities to the general public: common stock and interest-bearing investment certificates. Initially, the incorporators (and others close to them) received 47% of the stock. On its face, this was not illegal. The problem arises from the fact that while the stock was selling to the general public for $2 a share, the insiders received stock for "incorporation services" amounting to 285,000 shares in return for evaluated consideration of only $20,000.

In the very first year, American went from a surplus to a deficit net worth. In the early part of 1968, the Georgia Securities Commission forbade American to sell any more securities until a new prospectus had been filed. On or about April 5, 1968, a new prospectus, dated June 1, 1968, was submitted to the Commission and offered to the public. On the face of the financial statements contained in the new prospectus, it was obvious that the Company was insolvent. Finally, in May of 1969, the Company went out of business.

The Government concedes that neither the 1967 nor the 1968 prospectus was false *per se*, but it does contend that they were deliberately and fraudulently misleading.

In the Bench trial below, the hotly contested issues seemed to center around the commissions paid to the securities salesmen, the use of the proceeds received from the sale of the securities, the way the cash assets were presented, certain notes receivable, the value of the land in Florida, listing of unaudited values of a subsidiary alongside audited values, certain footnotes in the prospectuses, and the failure to list certain assets and debts.

The first prospectus represented that the expense of the sale and distribution of the securities would be no higher than 4% for the certificates and 15% for the stock. In actuality, the salesmen received 20% on the certificates and 33⅓% on the stock.

Next came the use of the proceeds of the securities sales. The prospectus showed that the Company would engage in the investment banking business by purchasing commerical paper, making secured loans, and purchasing securities of other companies. In actuality no funds were ever advanced toward the stated purposes—although American did assume certain obligations in the acquisition of the assets in Babee-Tenda Products Corporation, a wholly owned subsidiary of American. Instead, many loans were made to insiders, totalling $54,499, of which only $33,415 was ever repaid.

The third alleged misrepresentation concerns the cash assets stated in both prospectuses. In the first, the financial statement was drawn on the 13th day of December, 1966. Two days later, but before the prospectus was completed, a disbursement of $15,000 was made and recorded on the company's books as an exchange item. This item was later removed by an adjusting entry against capital.

In the second prospectus, the cash entry in the financial statement showed $42,809.25. The chief accountant with the Atlanta Regional Office of the Securities and Exchange Commission, the government's expert witness, testified that $40,000 of the sum was borrowed from a bank, placed in a savings account, and then pledged as collateral for the original loan. About a month later, the loan was repaid, and the savings account was closed. A footnote was included explaining this loan but when told such had to be included Walker asked that it not be the first one.

Another irregularity in the case was the failure of Bruce to include an outstanding check for $2,000 which was written prior to the date of the statement. This $2,000 was given as a down payment for an airplane which was not included in the assets of the Company, nor was the debt thus incurred included in the liabilities. Had the prospectus clearly reflected these items, the cash would have actually been $809.35, not $42,809.35.

The next questionable entry concerned a note for $20,000 given to American by Blackwood as payment for 40,000 shares of stock. The government contends that the entry and accompanying footnote were misleading. A footnote stated that Blackwood owed the Company $20,000 on a note receivable bearing 6% interest on or before December 8, 1967. It stated further that the only security for the note was 40,000 shares of American Capital Corporation. In actuality, the note contained a stipulation on the back that it could only be satisfied from the 40,000 shares and did not represent a general indebtedness on the part of Blackwood. The government contended that this was not a valid, enforceable note and should not have been included as such.

The biggest dispute arose over the use of a MAI appraisal for the value of the land American had title to in Florida. This property was purchased from Diversified Enterprises of Florida by incurring obligations amounting to $380,387.74 and issuing 35,000 shares of American stock. The government contended that the true value of the entire parcel did not amount to any more than the debt against it.

The value in the prospectus, based upon a MAI appraisal while the land was still in the hands of Diversified, was listed at $1,076,600. The government produced a witness who aided in the composition of the report and who stated that the report was an aggregate value based upon total sale of the individual lots, plus certain additions to the land which were to be made. He stated it did not represent the current value of the land as a whole, prior to subdivision and development.

A note in the first prospectus recorded the various debts of the Company but in exact terms it never stated how much the Company owed on the Florida property, nor did the prospectus reveal that the mortgage on the land was overdue

when the Company purchased it. The Government contends that the use of the MAI appraisal overstated the stockholders' equity by $716,212.26.

The second prospectus reported that the Florida property had been foreclosed. The Government was particularly affronted by the inclusion of the loss of this property in the comparative statement of income and expenses for the year 1968, contending that it should have been included in 1967's statement as that was the year the foreclosure actually occurred. By placing the loss in 1968, the Government contends that the stockholders' equity was grossly misstated for the year 1967.

Another of the Government's objections related to the inclusion of unaudited figures with audited figures in a footnote explaining the acquisition of Babee-Tenda Products Corporation. This entry, it contends, could be misleading to the buying public, as to the actual value of the property.

The controversial footnote showed, in essence, that the assets of Babee-Tenda Safety Products Corporation were acquired from Babee-Tenda's creditors in bankruptcy by exchanging 26,388 shares of American stock and by the assumption of $75,000 in notes payable. It further stated that the unaudited sales of the newly acquired company was approximately $2,000,000 per year, and the unaudited net worth was reported to be $289,000. Accordingly, this acquisition represented an unrealized, unaudited appreciation in the book value of American in excess of $211,000.

Evidence was also introduced clearly implicating Walker and Blackwood in a scheme whereby they bribed certain Labor Union officials to invest union pension funds in American investment certificates in violation of federal law. The fact that the Union had invested in these certificates was later used as a selling point in some of the Company's promotional material.

In getting down to the nuts and bolts, the Government conceded that the financial statements were not patently false, but asserted that by the addition of footnotes the perpetrators of this alleged fraud intended to mislead and did mislead the buying public into believing that the Company, although inescapably insolvent, had a good chance of becoming a one and a half million dollar company by paying $300,000 on an option to get back the Florida property and by merging with Diversified, which by the time of the second prospectus was in the throes of bankruptcy proceedings.

As a final clincher, the Government introduced evidence of wasteful spending by Walker and Blackwood. For instance, Walker rented a Cadillac, for which the Company paid $1,512. Payments amounting to $2,486.50 were made on Walker's personal automobile loans. The Company also paid $5,822.96 on apartment rent and furniture for Walker, and he received loans totalling $6,315.96 of which only $2,529.35 was ever repaid. In total, Walker received $47,907.14 in benefits from American.

Blackwood also received the use of a rented Cadillac for which the Company paid $1,576. At the time he had the Cadillac Blackwood did not receive any legal fees. Blackwood also received loans of $1,705.60. In total, Blackwood received $10,421.60.

Bruce only received $1,800 in professional fees, plus some expenses.

In the aggregate, the three Defendants received $60,128.74, or 20% of the cash taken in during the life of the Company.

The Government contends that each of the Defendants helped produce the means of inducement—both prospectuses —in the fraudulent scheme. The proof, viewed in the light most favorable to the prosecution, showed that Walker, Blackwood, and Bruce were primarily responsible for the compilation of "facts" which went into each of the prospectuses and that Blackwood actually prepared the footnotes for the second one. As the accountant, Bruce was responsible for the compilation and formulation of the

financial data contained in both. It is argued that since this was purely a professional service, involving matters of judgment, and was not *per se* false, Bruce should have been acquitted. Ordinarily, this should be so, but the record contains evidence clearly indicating that Bruce knew the full implications of what he was doing, yet hesitated not.

The appellate record is composed of twelve typewritten volumes.

In his written verdict, filed February 8, 1973, Judge Edenfield stated that he had "no hesitation in holding the defendant Walker guilty as charged" except for one count on which he found both Walker and Bruce not guilty.

He found Bruce and Blackwood not guilty on ten counts connected with the first prospectus.

As to the second prospectus, Judge Edenfield found that "all of the defendants *knew and could not have failed to know* (emphasis added) that the business they were conducting was a fraud"; that while the Company had collected "over $200,000 from the sale of stock and investment certificates, it had not devoted a single dollar of the Company's assets to the purposes for which the corporation was purportedly created, but instead had squandered and spent vast sums of the Company's assets * * * all without having earned one dime for stockholders or investors".

■ Essentially, a scheme to defraud is measured by a nontechnical standard. "It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society", Gregory v. United States, 5 Cir., 1958, 253 F. 2d 104, 109.

■ The scheme need not be fraudulent upon its face or misrepresent any material fact. All that is necessary is that it be a scheme reasonably calculated to *deceive* persons of ordinary prudence and comprehension. The intent of the crime is shown by the scheme itself— here, the active promotion of a company known to be inescapably insolvent by making impossible representations of possible wealth to potential investors, Silverman v. United States, 5 Cir., 1954, 213 F.2d 405, cert. denied, 348 U.S. 828, 75 S.Ct. 46, 99 L.Ed. 653 (1954).

■ We must conclude that there was substantial evidence in this case from which the Judge could determine that the defendants were guilty. That being so, his verdict stands impervious to appellate attack.

### Former Jeopardy

Defendant Walker, being the only one in a position to do so, objects to his conviction on Counts II and XII of the indictment, arguing that conviction of both violated his privilege against former jeopardy. Basically, Counts II and XII arose from the same set of facts, but the counts alleged violations of different statutes.

Although Walker does not show how he was prejudiced or harassed, such would be irrelevant as each count alleges commission of a separate offense.

■ Generally speaking, "where the same act or transaction constitutes a violation of two or more distinct statutory provisions, the test to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the others do not", Gavieres v. United States, 220 U.S. 338, 342, 31 S.Ct. 421, 55 L.Ed. 489 (1911).

■ Both statutes involved here have mutual elements of proof in all but one point. 15 U.S.C. § 77q(a) requires that the following elements be proved beyond a reasonable doubt:

"1. The offer or sale of a security;

"2. By use of the mails or some means of transportation or communication in interstate commerce; and

"3. That the defendant intentionally did any of the following:

(a) employed a device, scheme, or artifice to defraud;

(b) obtained money or property by means of material misrepresenta-

tions or material misleading missions;

(c) engage in a transaction, practice or course of business which would or did operate as a fraud or deceit upon a purchaser of securities."

■ All that is required to prove a mail fraud charge is (1) the scheme to defraud; representations known by the defendants to be false or misleading; some person or persons must have been defrauded, and (2) causing something to be sent through the mails in execution of the fraudulent scheme, Bass v. United States, 5 Cir., 1969, 409 F.2d 179, cert. denied, 396 U.S. 863, 90 S.Ct. 138, 24 L. Ed.2d 117, rehearing denied, 396 U.S. 950, 90 S.Ct. 378, 24 L.Ed.2d 256 (1969); Silverman v. United States, *supra*.

Although, as mentioned before, there are mutual elements of proof, there is one element in 77q(a) which is not present in § 1341—the offer or sale of a security. The result is that Walker's attack must fail for lack of complete mutality. See, also, United States v. Williams, 5 Cir., 1970, 424 F.2d 344; 447 F.2d 1285 (En Banc, 1971).

### *The Sale of Unregistered Securities in Interstate Commerce*

The ultimate question to be answered here is whether Blackwood could be considered an "underwriter" at the time of the attempted transfer to Mrs. Ruth Gaygan of stock which he personally owned.

15 U.S.C., § 77d(1) exempts the application of § 77e(a) to all *"transactions by any person other than an issuer, underwriter, or dealer"*. The Government, in its brief here, strongly contends that Blackwood comes within the definition of an underwriter as found in 15 U.S.C. § 77b(11). The pertinent portion of that section is as follows:

"The term 'underwriter' means any person *who has purchased from an is-suer with a view to, or offers or sells for an issuer in connection with, the distribution of any security*, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking. . . ." [Emphasis added.]

■ The Government has overlooked two essential elements to a valid conviction. First, it argues that Blackwood does not come within the § 77d(1) exemption because he is an underwriter; i. e., one who provides an outlet for the stock of an "issuer", United States v. Re, 2 Cir., 1964, 336 F.2d 306, cert. denied, 379 U.S. 904, 85 S.Ct. 188, 189, 13 L.Ed.2d 177 (1965). The fact is apparent that the government is in actuality arguing that Blackwood falls within a class—i. e., "underwriters"—while overlooking the point that § 77d(1) exempts transactions, not classes, Pennaluna & Company v. S. E. C., 9 Cir., 1969, 410 F.2d 861, cert. denied, 396 U.S. 1007, 90 S.Ct. 562, 24 L.Ed.2d 499 (1969).

■ Since it is the transaction which provides the indicia of the crime, the Government must prove that the transaction complained of is, in fact, a violation. As § 77b(11) stated, an underwriter is one who takes from an issuer with a view toward distribution to the general public. The Government has failed to produce any evidence that Blackwood did anything but acquire stock from American for his own personal account. The facts further show that the circumstances under which Blackwood attempted to transfer 2,000 shares of his stock to Mrs. Gaygan was a personal matter, spanning a four to five year period, and in no way involved a solicitation of the type covered by 15 U.S.C. § 77e(a).

The result is that we reverse Blackwood's conviction on Count 14.

Except as to Blackwood's conviction on Count 14, which is reversed, the judgment of the District Court is, in all other respects, affirmed.