[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 02, 2009
THOMAS K. KAHN
CLERK

_____

No. 05-13809

_____

D. C. Docket No. 04-00010-CR-3-001-MCR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID W. SVETE,
RON GIRARDOT,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

**(February 2, 2009)**

Before EDMONDSON, Chief Judge, and TJOFLAT, ANDERSON, BIRCH,
DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON, PRYOR
and KRAVITCH,* Circuit Judges.

---

* Senior Circuit Judge Kravitch elected to participate in this decision, pursuant to 28
U.S.C. § 46(c).

PRYOR, Circuit Judge:

This appeal presents the question whether the crime of mail fraud, which prohibits "<u>any</u> scheme or artifice to defraud" by use of the mail, 18 U.S.C. § 1341 (emphasis added), requires proof that the scheme be capable of deceiving a reasonably prudent person or whether schemes aimed at the gullible or improvident are also prohibited. David W. Svete and Ron Girardot appeal their convictions for mail fraud and argue that the district court erred when it refused to instruct the jury that the government must prove that Svete and Girardot devised a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension. The district court instead delivered the pattern jury instructions for mail fraud. Committee on Pattern Jury Instruction, Judicial Council of the Eleventh Circuit, <u>Pattern Jury Instructions (Criminal Cases)</u> § 50.1 (West 2003). A panel of this Court held that the district court erred based on our precedent in <u>United States v. Brown</u>, 79 F.3d 1550 (11th Cir. 1996), and ordered a new trial as to the counts of mail fraud. <u>United States v. Svete</u>, 521 F.3d 1302, 1310–11 (11th Cir. 2008), <u>vacated</u>, 532 F.3d 1133 (11th Cir. 2008). We granted rehearing en banc to determine whether to overrule our decision in <u>Brown</u>. Because <u>Brown</u> is inconsistent with both the plain language of the mail fraud statute and precedents of the Supreme Court, we overrule <u>Brown</u> and hold that the district court did not

2

err when it gave the pattern jury instruction for mail fraud. We affirm the decision not to deliver the jury instruction about mail fraud requested by Svete and Girardot and remand to the panel for consideration of any remaining issues.

## I. BACKGROUND

Svete, Girardot, and their agents were in the business of selling financial interests in viatical settlements, which are financial products based on agreements with persons (known as viators) who have terminal illnesses and sell their life insurance policies to third parties for less than the mature value of the policies to benefit from the proceeds while alive. Companies controlled by Svete obtained more than one hundred million dollars from more than 3000 investors, more than a third of whom were over the age of 65. Investors who purchased these financial interests from agents of Svete and Girardot testified at trial that the sales agents made false statements and provided them with literature that contained false statements about the life expectancies of viators, the status of the life insurance contracts, and the risks associated with the investments.

Thirty-five investors testified at the trial that sales agents told them that the insurance policies were held by terminally ill patients as determined by independent medical specialists who had access to the viators' complete medical records and doctors, but these statements by the sales agents were false. The

viators were not terminally ill, and the information that was reviewed by independent medical professionals was incomplete. The information about many viators was never reviewed by independent doctors. Svete directed a medical underwriter who worked for him to create sham opinions of life expectancy and endorse them with the forged signatures of independent physicians. Some investors testified that they were told that "nobody lives past the terminally ill date," and other investors were told that the viators were supposed to die within six months and, if the viator did not die in that time, the investors need not worry. Many of the investments failed to mature when expected, and the investors were obligated to make additional premium payments when the viator lived longer than expected.

Investors who purchased interests in the viatical settlements were required to sign contracts that acknowledged that the investors had not relied on any representations other than those contained in the contracts. The contracts also contained acknowledgments that the investors were sophisticated in financial matters and had sought or had access to professional advice and that the projected demise dates were only estimates. Several of the investors testified at trial that they did not read or did not understand the contracts and relied on the statements of the sales agents. Nanette Zima, who served as president of LifeTime Capital, Inc.,

4

which was the brokerage company formed by Svete in 1997, testified that Svete and Girardot instructed her to alter contracts that had previously been signed by investors without the knowledge or consent of the investors who had signed them.

As a defense to the charges of mail fraud, Svete and Girardot argued that a person of ordinary prudence and sophistication would have read the contracts and ignored the false statements by the sales agents. Svete and Girardot requested the following jury instruction based on that argument:

> To prove a fraud crime, the government must show that the defendant under consideration intended to devise or participate in a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension. The person of ordinary prudence standard is an objective standard and is not directly related to the gullibility or level of knowledge and experience of any specific person or persons. For purposes of this offense, the government must prove that a reasonable person of average prudence and comprehension would have acted on the representation made by the defendant under consideration.

The district court rejected the requested jury instruction.

The district court instead gave the pattern jury instruction on mail fraud, which defines a "scheme to defraud" to include "any plan or course of action intended to deceive or cheat someone out of money or property by means of false or fraudulent pretenses, representations, or promises." Pattern Jury Instructions (Criminal Cases) § 50.1, at 282 (West 2003). As part of that instruction, the district court defined materiality: "A material fact is a fact that would be important

5

to a reasonable person in deciding whether to engage or not to engage in a particular transaction. A fact is material if it has a natural tendency to influence or is capable of influencing the decision of the person or entity to whom or which it is addressed." Id. The jury found the defendants guilty of mail fraud.

## II. STANDARDS OF REVIEW

"We review a district court's refusal to give a requested jury instruction for abuse of discretion." United States v. Carrasco, 381 F.3d 1237, 1242 (11th Cir. 2004). "In considering the failure of a district court to give a requested instruction, the omission is error only if the requested instruction is correct, not adequately covered by the charge given, and involves a point so important that failure to give the instruction seriously impaired the party's ability to present an effective case." Wood v. President and Trs. of Spring Hill Coll. in City of Mobile, 978 F.2d 1214, 1222 (11th Cir. 1992). We review de novo whether a jury instruction mischaracterized the law or misled the jury to the prejudice of the defendant. United States v. Gray, 367 F.3d 1263, 1271 (11th Cir. 2004). "[T]he district court is given wide discretion as to the style and wording employed in the instructions," Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1276 (11th Cir. 2008), and we will reverse only if we are "'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.'" Somer v. Johnson, 704

6

F.2d 1473, 1478 (11th Cir. 1983) (quoting Miller v. Universal City Studios, Inc., 650 F.2d 1365, 1372 (5th Cir. 1981)).  Questions of statutory construction are reviewed de novo.  United States v. Evans, 478 F.3d 1332, 1341 (11th Cir. 2007).

### III. DISCUSSION

The mail fraud statute prohibits use of the mails in furtherance of "any scheme or artifice to defraud."  18 U.S.C. § 1341.  "[T]he words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'"  McNally v. United States, 483 U.S. 350, 358, 107 S. Ct. 2875, 2881 (1987) (quoting Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S. Ct. 511, 512 (1924)).  "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  United States v. Gonzales, 520 U.S. 1, 5, 117 S. Ct. 1032, 1035 (1997) (quoting Webster's Third New International Dictionary 97 (1976)).  Use of the word "any" without limiting language should be read to mean "all."  See id.

The prohibition of "any scheme or artifice to defraud" derives from the original statute enacted in 1872 as part of a recodification of the postal laws.  Act of June 8, 1872, ch. 335, § 301, 17 Stat. 323.  "Congress intended from the beginning that the statute be given a very broad application and approved and

7

fostered this broad application at every opportunity." Jed S. Rakoff, The Federal Mail Fraud Statute (Part I), 18 Duq. L. Rev. 771, 822 (1980). Congress enacted the statute to curtail an epidemic of "large-scale swindles, get-rich-quick schemes, and financial frauds." Id. at 780. That phenomenon made it "'apparent that rudimentary criminal codes, conceived for rural societies and confined by state lines and local considerations, could not cope with those who saw manifold opportunities for gain in the new activities.'" Id. (quoting Abraham S. Goldstein, Conspiracy to Defraud the United States, 68 Yale L.J. 405, 420–21 (1959)).

More than a century ago, in its first interpretation of the statute, the Supreme Court held that the prohibition of mail fraud "includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." Durland v. United States, 161 U.S. 306, 313, 16 S. Ct. 508, 511 (1896). The defendant, Durland, had been convicted of mail fraud and argued that the statute reached "only such cases as, at common law, would come within the definition of 'false pretenses,'" which would mean that "there must be a misrepresentation as to some existing fact, and not a mere promise as to the future." Id. at 312, 16 S. Ct. at 511. The Supreme Court squarely rejected that argument: "The statute is broader than is claimed." Id. at 313, 16 S. Ct. at 511. The Court relied on the "letter" of the statute, which prohibits "[a]ny scheme or

artifice to defraud." Id. (internal quotation marks omitted). The Supreme Court

explained that the object of the criminal prohibition is the intent of the malefactor,

not the reasonableness of the victim:

> We do not wish to be understood as intimating that, in order to
> constitute the offense, it must be shown that the letters so mailed were
> of a nature calculated to be effective in carrying out the fraudulent
> scheme. It is enough if, having devised a scheme to defraud, the
> defendant, with a view of executing it, deposits in the post office
> letters which he thinks may assist in carrying it into effect, although,
> in the judgment of the jury, they may be absolutely ineffective . . . .

Id. at 315, 16 S. Ct. at 512. A fanciful scheme may nonetheless be a scheme to

defraud. See also United States v. Stever, 222 U.S. 167, 174, 32 S. Ct. 51, 53

(1911) ("A scheme to defraud by means of false pretenses is . . . a 'scheme or

artifice to defraud,' within the plain meaning and purpose of this section.").

Although the common law crime of cheat applied only to frauds that would

deceive a person of ordinary prudence, by the time Congress enacted the

prohibition of mail fraud, statutes that prohibited false pretenses had remedied this

deficiency in the common law. 2 Francis Wharton, A Treatise on the Criminal

Law of the United States §§ 2056, 2128 at 514, 560 (7th ed., Philadelphia, Kay &

Brother, 1874). As a commentator explained, "It was in part to meet this difficulty

that the statute of false pretenses was passed, and under this statute it has been

repeatedly held that it matters not how patent the falsity of a pretence may be, if it

9

succeeds in defrauding." Id. § 2128, at 560. The trend of case law in the 1870s and 1880s was that statutes against false pretenses protected both the gullible and the savvy. See id. §§ 2128–2132b, at 560–62; 2 Joel Prentiss Bishop, Commentaries on the Criminal Law § 433, at 239 (6th ed., Boston, Little, Brown, & Co. 1877) ("[O]lder cases" held that false pretenses must "be such as is calculated to mislead men of ordinary prudence . . . . But, in reason, and it is believed according to the better modern authorities, a pretence calculated to mislead a weak mind, if practised on such a mind, is just as obnoxious to the law . . . .").

Congress has never used any language that would limit the coverage of the mail fraud statute to schemes that would deceive only prudent persons. To the contrary, the sponsor of the original statute explained that its purpose was "'to prevent the frauds which are mostly gotten up in the large cities . . . by thieves, forgers, and rapscallions generally, for the purpose of deceiving and fleecing the innocent people in the country.'" McNally, 483 U.S. at 356, 107 S. Ct. at 2879 (quoting Cong. Globe, 41 Cong., 3d Sess. 35 (1870) (remarks of Rep. Farnsworth during debate in previous Congress)). When the statute was amended in 1889 to prohibit schemes to sell counterfeit money, the Senate report reiterated a concern for the ignorant and naive:

10

A certain class of persons . . . send out circulars through the United States mails which appeal to the cupidity of the ignorant and hold out to the unfortunate the temptation to try to better their fortunes . . . . Farmers and country merchants and country postmasters are constantly plied with these circulars, . . . and plain as the fraud is upon its face, these men reap a golden harvest. The city papers frequently contain notices of the ignorant victims who venture to the cities and are relieved of their money; but there is no notice of the many smaller dupes who send their money through the mails in answer to these advertisements and pocket their losses . . . . This bill . . . will, if properly enforced, put an end to this infamous business.

S. Rep. No. 50–2566, at 2 (1889). When the statute was amended in 1909 to "codify the holding of Durland," McNally, 483 U.S. at 357, 107 S. Ct. at 2880, by adding the words "or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" after the phrase "any scheme or artifice to defraud," a wealth of case law explained that the crime of false pretenses did not have a reasonable victim requirement and that a contrary rule was against "the great weight of authority." State v. Phelps, 84 P. 24, 26 (Wash. 1906) ("[I]t is the rule in Indiana and perhaps one or two other states that a false pretense, to be criminal, must be of some fact as would tend to deceive a person of ordinary prudence and common intelligence[,] but the great weight of authority is to the opposite effect.") (citations omitted); State v. Keyes, 93 S.W. 801, 805–08 (Mo. 1906) (The rule that there is no fraud where a victim could easily investigate is "opposed by the overwhelming weight of authorities in this country."); State v.

11

Jackson, 105 N.W. 51, 53–54 (Iowa 1905); Commonwealth v. Beckett, 84 S.W. 758, 759 (Ky. 1905); State v. Stewart, 83 N.W. 869, 870–71 (N.D. 1900); People v. Summers, 73 N.W. 818, 821 (Mich. 1898); Oxx v. State, 35 A. 646, 647 (N.J. 1896); Miller v. People, 45 P. 408, 408–09 (Colo. 1896); Thomas v. State, 113 Ill. 531, 537–38 (1885).

In addition to this settled understanding of the broad reach of the prohibition of mail fraud, the Supreme Court recently held "that materiality of falsehood is an element of the federal . . . fraud statutes." Neder v. United States, 527 U.S. 1, 25, 119 S. Ct. 1827, 1841 (1999). The Court invoked "the rule that Congress intends to incorporate the well-settled meaning of the common-law terms it uses" and explained that "at the time of the mail fraud statute's original enactment in 1872, and later when Congress enacted the wire fraud and bank fraud statutes, actionable 'fraud' had a well-settled meaning at common law." Id. at 22–23, 119 S. Ct. at 1840. The Court also explained that "the fraud statutes did not incorporate all the elements of common-law fraud. The common-law requirements of 'justifiable reliance' and 'damages,' for example, plainly have no place in the federal fraud statutes" because Congress prohibited the "'scheme to defraud,' rather than the completed fraud." Id. at 24–25, 119 S. Ct. at 1841. As both the modern and ancient authorities on the common law cited by the Court explain, materiality was

12

understood to be a component of reasonable reliance at common law.  Id. at 22–23,

119 S. Ct at 1840; see  Restatement (Second) of Torts §§ 537 cmt. b, 538 & cmt. a,

at 80–81 (1977) ("The rules stated in this Section [about materiality] are concerned

only with whether the recipient's reliance upon the misrepresentation is

justifiable."); W. Page Keeton et al., Prosser and Keeton on Torts § 108 (5th ed.

1984); Smith v. Richards, 38 U.S. 26 (1839); Joseph Story, Commentaries on

Equity Jurisprudence § 191, at 115–16 (1st English ed., London, Stevens &

Haynes 1884).

All the sources cited by the Supreme Court support the proposition that

materiality may be proved without establishing that the misrepresentation was

objectively reliable.  Section 538 of the Restatement (Second) of Torts defines

materiality, for example, and that definition, in subpart (b), includes

misrepresentations that are aimed at recipients who would regard them as

important even if a reasonable person would not:

> The Restatement instructs that a matter is material if:
> "(a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or
> (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it."

Neder, 527 U.S. at 22 n.5, 119 S. Ct. at 1840 n.5 (quoting Restatement (Second) of

13

Torts § 538, at 80).  Under the Second Restatement, a victim of fraud need not

"exercise the care of a reasonable man for his own protection."  Restatement

(Second) of Torts § 545A cmt. a, at 100–01; see also id. § 540, at 88.  Prosser and

Keeton similarly explain "the general rule" that "where there is an intent to mislead

. . . mere negligence of the plaintiff is not a defense to an intentional tort."  W.

Page Keeton et al., Prosser and Keeton on Torts § 108 (5th ed. 1984).  In Smith v.

Richards, the Supreme Court ruled that a seller's misrepresentation of the value of

property that he knew the buyer had never seen or investigated was material.  38

U.S. at 39.  Justice Story likewise explained that it is "a very old head of equity,

that if a representation is made to another person, going to deal in a matter of

interest, upon the faith of that representation, the former shall make that

representation good, if he knows it to be false."  Joseph Story, Commentaries on

Equity Jurisprudence § 191, at 115–16 (1st English ed., London, Stevens &

Haynes 1884).

The objective reliability of a misrepresentation is sufficient to establish its

materiality, but proof of objective reliability is not necessary to establish

materiality if the defendant knows or should know that the victim is likely to

regard the misrepresented facts as important.  In the words of the Restatement,

"[o]ne who practices upon another's known idiosyncracies cannot complain if he is

14

held liable when he is successful in what he is endeavoring to accomplish." Id. § 538 cmt. f, at 82. "The focus of the language defining a scheme to defraud is on the violator, not the victim." United States v. Drake, 932 F.2d 861, 864 (10th Cir. 1991).

Because the focus of the mail fraud statute, like any criminal statute, is on the violator, the purpose of the element of materiality is to ensure that a defendant actually intended to create a scheme to defraud. Proof that a defendant created a scheme to deceive reasonable people is sufficient evidence that the defendant intended to deceive, but a defendant who intends to deceive the ignorant or gullible by preying on their infirmities is no less guilty. Either way, the defendant has criminal intent.

Neder instructs us to reject the elements of the common law that "would clearly be inconsistent with the statutes Congress enacted," 527 U.S. at 25, 119 S. Ct. at 1841, and whatever role, if any, a victim's negligence plays as a bar to civil recovery, it makes little sense as a defense under a criminal statute that embraces "any scheme or artifice to defraud." 18 U.S.C. § 1341 (emphasis added). A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence. See Keeton et al., supra, § 108, at 751. The leading commentators on tort law have explained that, in a civil action, a victim's imprudence is ordinarily

15

no defense for a defendant who knowingly exploits that imprudence:

> It is a sufficient indication that the person deceived is not held to the standard of precaution, or of minimum knowledge, or of intelligent judgment, of the hypothetical reasonable man, that people who are exceptionally gullible, superstitious, ignorant, stupid, dim-witted, or illiterate, have been allowed to recover when the defendant knew it, and deliberately took advantage of it.

Id. (footnotes omitted).

Despite the plain text of the statute and longstanding precedents of the Supreme Court, in Brown we held that mail fraud requires proof of a scheme to defraud that is objectively reliable unless the defendant is a fiduciary of the intended victim. 79 F.3d at 1558. We reversed convictions of defendants who had "approved and promoted lies about the investment potential" of real estate in Florida because the prospective investors in those homes could have discovered the truth from "readily available external sources." Id. at 1558–60. We held that "federal criminal fraud requires proof that a person of ordinary prudence would rely on a representation or a deception[,]" id. at 1558, and concluded that a person of ordinary prudence would have investigated the value of Florida real estate instead of relying on the misrepresentations by the defendants, id. at 1561.

We "thought about whether" the targeting of customers that the defendant "may have thought to be naive [was] relevant to our analysis[,]" but explained that "the 'person of ordinary prudence' rule is an objective standard, making the

16

subjective thoughts and acts of specific people generally irrelevant." Id. at 1560 n.18. We explained that the defendants in Brown did not target "a group of persons traditionally provided heightened protection by the law of fraud," id., but we did not cite a source or describe a standard for determining who deserves such heightened protection. We instead recited a narrow list of examples: "the blind, the deaf, [and] the mentally incapacitated." Id. That list suggests that the mail fraud statute protects a class of persons significantly smaller than, for example, the class protected by the vulnerable-victim enhancement under the sentencing guidelines, United States Sentencing Guidelines § 3A1.1(b)(1) (Nov. 2007), which applies to the elderly, id. cmt. n.2(b), and immigrants, see, e.g., United States v. Caballero, 277 F.3d 1235, 1251 (10th Cir. 2002); United States v. Mendoza, 262 F.3d 957, 961 (9th Cir. 2001); United States v. Bengali, 11 F.3d 1207, 1212 (4th Cir. 1993), among other frequent targets of fraud.

Brown quoted language from earlier precedents that had explained neither actual deception nor reliance was necessary to establish mail fraud if the defendant had the conscious intent to defraud. In Pelletier v. Zweifel, we explained "that the government can convict a person for mail or wire fraud even if his targeted victim never encountered the deception—or, if he encountered it, was not deceived." 921 F.2d 1465, 1498 (11th Cir. 1991). "Instead," we explained, "the court uses a

17

reasonable person test to determine whether, if the scheme had been executed, the intended victim would have acted on the misrepresentations: were the misrepresentations 'reasonably calculated to <u>deceive</u> persons of ordinary prudence and comprehension.'" <u>Id.</u> at 1498 (quoting <u>United States v. Bruce</u>, 488 F.2d 1224, 1229 (5th Cir. 1973)). In the absence of actual deception, a scheme "reasonably calculated to deceive persons of ordinary prudence" is some evidence that the defendant possessed the necessary mens rea, or "'a conscious knowing intent to defraud.'" <u>Id.</u> at 1498–99 (quoting <u>United States v. Kreimer</u>, 609 F.2d 126, 128 (5th Cir. 1980) (internal quotation omitted)). <u>Brown</u> relied on this language regarding evidence of intent to create a requirement of proof that the scheme be capable of deceiving an objectively reasonable person.

Because it was bound by <u>Brown</u>, the panel that first reviewed this appeal had no choice but to reverse the conviction for mail fraud. A defendant is entitled to an instruction relating to a theory of defense for which there is any foundation in the evidence, <u>see</u> <u>United States v. Palma</u>, 511 F.3d 1311, 1315 (11th Cir. 2008), and the evidence at trial supported an inference that ordinary prudence would have counseled the victims to rely on the documents that they signed, not the misrepresentations of salesmen. The United States did not prove facts that would take this appeal outside of the rule of <u>Brown</u>, for example, that the defendants were

18

fiduciaries of the victims or that the victims were "blind, . . . deaf[,] . . . mentally incapacitated" or members of another group of persons traditionally provided heightened protection by the law of fraud. Brown, 79 F.3d at 1559–60 & n.18.

Because Brown is inconsistent with both the broadly worded text of the mail fraud statute, 18 U.S.C. § 1341, and the interpretation of that statute by the Supreme Court, Neder, 527 U.S. at 25, 119 S. Ct. at 1841; Durland, 161 U.S. at 313, 16 S. Ct. at 511, we overrule our holding in Brown that the offense of mail fraud requires proof of a scheme calculated to deceive a person of ordinary prudence. When we decided Brown, we acknowledged that our holding was contrary to the decisions of at least two of our sister circuits, 79 F.3d at 1557 (citing United States v. Brien, 617 F.2d 299, 311 (1st Cir. 1980); United States v. Maxwell, 920 F.2d 1028, 1036 (D.C. Cir. 1990)), but our decision, in fact, was contrary to the interpretations of several circuits, including that of the former Fifth Circuit. Brown still stands alone. It has been rejected by other circuits. It has been distinguished on debatable grounds within our Circuit. It has been criticized in legal scholarship.

Our decision in Brown departed from a principle that most circuits had treated, and continue to treat, as settled: the mail fraud statute does not "differentiate between schemes that will ensnare the ordinary prudent investor and

19

those that attract only those with lesser mental acuity[,]" Brien, 617 F.2d at 311; accord Maxwell, 920 F.2d at 1036; Lemon v. United States, 278 F.2d 369, 373 (9th Cir. 1960); United States v. Sylvanus, 192 F.2d 96, 105 (7th Cir. 1951), or that "[t]he negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct." United States v. Coyle, 63 F.3d 1239, 1244 (3d Cir. 1995). In contrast with Brown, other circuits long ago had recognized that the subjective unreasonableness of a statement is persuasive evidence that the statement was criminally fraudulent. See Norman v. United States, 100 F.2d 905, 907 (6th Cir. 1939); Rudd v. United States, 173 F. 912, 913 (8th Cir. 1909). One circuit, in the several years before we decided Brown, had searched but could "not find any cases" that supported the "position that a scheme to defraud is a violation only if it would deceive a reasonably prudent person." Drake, 932 F.2d at 864.

The former Fifth Circuit, from which the phrase "person[] of ordinary prudence" originated in the context of mail fraud, see Silverman v. United States, 213 F.2d 405, 407 (5th Cir. 1954), had long ago assumed in dicta that "'the monumental credulity of the victim is no shield for the accused[,]'" Blachly v. United States, 380 F.2d 665, 672 n.13 (5th Cir. 1967) (quoting Deaver v. United States, 155 F.2d 740, 745 (D.C. Cir. 1946)); see also Whitehead v. United States, 245 F. 385, 389–90 (5th Cir. 1917) ("[F]ew schemes, however transparent, would

20

fail to find some victims."), and it later expressly held that "[t]he victim's negligence is not a defense to criminal conduct[,]" Kreimer, 609 F.2d at 132. The late Judge Alvin Rubin explained, "The truth about virtually every scheme to defraud could be obtained if the gull were clever and diligent enough. . . . The laws protecting against fraud are most needed to protect the careless and the naive from lupine predators, and they are designed for that purpose." Id.

Brown distinguished Kreimer as limited to relationships that are "'fiduciary in nature,'" Brown, 79 F.3d at 1557, but nothing in Kreimer suggests that its holding was based on the nature of the relationship. The decisions that Kreimer cited in support of its holding, Blachly, 380 F.2d at 672, and Lemon, 278 F.2d at 373, did not involve fiduciary relationships, and other circuits, including the Fifth Circuit, have not read Kreimer as limited to the context of a fiduciary relationship. See, e.g., United States v. Thomas, 377 F.3d 232, 243 (2d Cir. 2004); United States v. Davis, 226 F.3d 346, 359 (5th Cir. 2000); Coyle, 63 F.3d at 1244.

Brown remains anomalous. Those circuits that have considered the issue after Brown have rejected our position, see United States v. Colton, 231 F.3d 890, 903 (4th Cir. 2000); Davis, 226 F.3d at 359, and one circuit has expressly rejected our decision twice. United States v. Amico, 486 F.3d 764, 780 (2d Cir. 2007); Thomas, 377 F.3d at 242. After we decided Brown, Judge Posner wrote for the

21

Seventh Circuit that it was "hard to believe" that the language that we used in

Brown was "intended to be understood literally, for if it were it would invite con

men to prey on people of below-average judgment or intelligence, who are anyway

the biggest targets of such criminals and hence the people most needful of the

law's protection[.]" United States v. Coffman, 94 F.3d 330, 334 (7th Cir. 1996).

According to one treatise, Brown "is the only major criminal case where the court

absolved the defendants by finding unreasonable reliance by the alleged victim of

fraud." 1 Joel Androphy, White Collar Crime § 8:2.70 (2d ed. 2006).

In the years since we decided Brown, we have been reluctant to apply that

precedent literally. We have not reversed a conviction for mail fraud based on the

objective unreliability of a misrepresentation in a published decision since Brown,

but we have affirmed several convictions based on schemes that were more

fanciful than the scheme that Brown addressed. In United States v. Schlei, we

rejected a Brown defense to a fraud conviction based on a scheme to sell financial

instruments that were purportedly secured by a "'secret fund to be used for various

purposes not suitable for public view' [that] was created in Japan by General

MacArthur and Japanese officials approximately fifty years ago," 122 F.3d 944,

966–67 (11th Cir. 1997), and in United States v. Twitty we rejected the application

of Brown where the misrepresentation was made by a loan applicant to a lender,

22

107 F.3d 1482, 1493 (11th Cir. 1997).  Our efforts to distinguish Brown divided the panel in Gray, which addressed a mail fraud conviction based on a request to a defendant in a collateral criminal trial for $185,000 to bribe jurors.  367 F.3d at 1267–68.  The request was accompanied by a representation that "United States Senator Jesse Helms, some congressmen, and a five-star general were inclined to help" the defendant.  Id. at 1267.  The majority recognized that misrepresentations used in the scheme "would seem absurd or fanciful to a reasonable person," id. at 1268, but upheld the conviction.  The dissent argued, with some force, that the majority opinion conflicted with Brown and stated, "Whether or not we agree with this Court's decision in Brown, we are bound by it."  Id. at 1274 & n.1 (Barkett, J., dissenting).  In 2003, we held that Brown had been overruled, see United States v. Yeager, No. 02-11265, slip op. 8 (11th Cir. Mar. 12, 2003), but we later vacated that decision, United States v. Yeager, 331 F.3d 1216, 1218 (11th Cir. 2003).

A note in the Columbia Law Review persuasively criticized our reliance in Brown on "civil-fraud concepts" that "limit the right to rely on representations and apply the doctrine of caveat emptor."  Mark Zingale, Note, Fashioning a Victim Standard in Mail and Wire Fraud: Ordinarily Prudent Person or Monumentally Credulous Gull?, 99 Colum. L. Rev. 795, 817 (1999).  "Applying an objective standard to civil fraud makes more sense because the victim, not the government,

23

makes the complaint in those cases, and the objective standard serves to guard against opportunistic lawsuits by parties claiming to have been defrauded but really only seeking restitution or pecuniary gain." Id. at 817–18. The note argued that "this motivation [for pecuniary gain] does not . . . corrupt the prosecution of criminal fraud." Id. at 818.

Svete and Girardot cite decisions that use the "ordinary prudence" language as evidence that fraud requires a scheme capable of defrauding the reasonably prudent, but none of the decisions cited by Svete and Girardot overturned a conviction on the ground that the scheme was incapable of deceiving persons of ordinary prudence. The "ordinary prudence" language was invoked instead to affirm convictions. United States v. Jamieson, 427 F.3d 394, 415 (6th Cir. 2005); United States v. Shepard, 396 F.3d 1116, 1124 (10th Cir. 2005); United States v. Hawkey, 148 F.3d 920, 924 (8th Cir. 1998); United States v. Yoon, 128 F.3d 515, 523–24 (7th Cir. 1997); Coyle, 63 F.3d at 1243–44. Two sister circuits have stated that "ordinary prudence" has a place in the proof of mail fraud, but both held that the jury instructions about materiality were sufficient to establish that the jury had found the fraudulent schemes reliable. Jamieson, 427 F.3d at 415; United States v. Fredette, 315 F.3d 1235, 1240–42 (10th Cir. 2003). The Sixth Circuit had previously explained that "the lack of guile on the part of those generally solicited

24

may itself point with persuasion to the fraudulent character of the artifice," Norman, 100 F.2d at 907, and the Tenth Circuit had previously stated, "We find no precedent supporting [the] position that a scheme to defraud is a violation only if it would deceive a reasonably prudent person." Drake, 932 F.2d at 864. None of these decisions reversed a conviction of mail fraud for failure to instruct the jury that the alleged scheme had to be capable of deceiving people of ordinary prudence, and none reached the perverse result of insulating criminals who target those least likely to protect themselves.

Svete and Girardot also invoke the rule of lenity as a rule of construction that requires us to incorporate proof of ordinary prudence when construing the mail fraud statute. They argue that the language "any scheme or artifice to defraud" is unclear and that we must construe the statute narrowly. We disagree.

"[T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." United States v. Lanier, 520 U.S. 259, 266, 117 S. Ct. 1219, 1225 (1997). The rule of lenity is applied when a broad construction of a criminal statute would "criminalize a broad range of apparently innocent conduct." Liparota v. United States, 471 U.S. 419, 426, 105 S. Ct. 2084, 2088 (1985). "[I]t is reasonable that a fair warning should be given to the world in

25

language that the common world will understand, of what the law intends to do if a certain line is passed.  To make the warning fair, so far as possible the line should be clear," McBoyle v. United States, 283 U.S. 25, 27, 51 S. Ct. 340, 341 (1931), but "[t]he mere possibility of articulating a narrower construction . . . does not by itself make the rule of lenity applicable." Smith v. United States, 508 U.S. 223, 239, 113 S. Ct. 2050, 2059 (1993).  "Instead, that venerable rule is reserved for cases where, 'after seizing every thing from which aid can be derived,' the Court is 'left with an ambiguous statute.'" Id. (quoting United States v. Bass, 404 U.S. 336, 347, 92 S. Ct. 515, 522 (1971) (internal quotation marks omitted)).

The rule of lenity is inapplicable.  The language of the mail fraud statute prohibits "any scheme or artifice to defraud," 18 U.S.C. § 1341 (emphasis added), and the word "any" conveys the broad and unambiguous reach of the statute.  The prohibition of schemes that target the improvident also does not " criminalize a broad range of apparently innocent conduct." Liparota, 471 U.S. at 426, 105 S. Ct. at 2088.

The district court did not err when it delivered the pattern jury instruction.  Mail fraud does not require proof that a scheme to defraud would deceive persons of ordinary prudence.  The district court instructed the jury regarding all the elements necessary to convict Svete and Girardot of mail fraud. Pattern Jury

26

Instructions (Criminal Cases) § 50.1 (West 2003).

Svete and Girardot also raise issues beyond the scope of our review. They argue that the evidence was insufficient to support their convictions for mail fraud; the district court erred in its evidentiary rulings under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); the district court erred in calculating the amount of loss; the restitution order was erroneous; the evidence was insufficient to establish a conspiracy to commit money laundering; and the sentences for the mail fraud counts exceeded the statutory maximum. We do not address these arguments, as they are outside the scope of the issue that we decided to reconsider en banc. We remand those and any other remaining issues to the panel for further consideration.

## IV. CONCLUSION

We **AFFIRM** the decision not to deliver the jury instruction about mail fraud requested by Svete and Girardot and **REMAND TO THE PANEL** for further consideration of any remaining issues.

EDMONDSON, Chief Judge, concurring in the result, in which BIRCH, Circuit Judge, joins:

This case is a statutory construction case involving an old statute. In defining the acts that the statute declares to be criminal, we must put aside our modern perceptions and preoccupations. Our job is to determine what Congress intended at the time the statute was made law.

Briefly stated, I believe that the pertinent mail-fraud statute requires the government ordinarily[1] to show that the pertinent scheme or misrepresentation was capable of inducing reliance on the part of a reasonable person exercising ordinary prudence for the protection of his own interests.[2] Our -- and some other Circuits'-- case law has set out this kind of objective standard for decades.

This objective standard was part of the common law of fraud, as I understand it, when the statute was written (1872) and last amended (1909) on point. From the words Congress used, read in the context of that time, I believe Congress intended to incorporate established common law into this then-new,

---

[1] The common law recognized exceptions when fiduciary relations were involved or where a fraud targeted persons historically receiving heightened protection, for example, children, the blind, or the mentally disabled. I suppose that these common law exceptions to the ordinary-prudence standard also are part of the statute. I will assume that no exceptions are presented by this case, however.

[2] Different elements, including materiality, must also be proved.

criminal statute.[3]  (But a few specific elements -- actual reliance by a victim and damages -- of common law fraud were implicitly dropped out because the statute expressly reaches intended fraud rather than completed fraud: the scheme, not the result of the scheme, is the crime; no actual victim need exist.)  The keynote of the mail-fraud statute is this language:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . .

I believe this language meant and means that the mail-fraud statute reaches use of the mail to advance deceptions of whatever kind that meet the test of common law fraud when the statute was enacted but excludes acts that would not meet the test of common law fraud when the statute was enacted.

Especially given the many different jurisdictions in our country, I acknowledge that capturing the common law in the United States for a given year can be difficult when we are looking back a hundred years or so.  But I submit that, **if** the historical view I have restated today is not plainly correct, this previously

---

[3] I think the common law fraud Congress intended to take in and to criminalize for the mail-fraud statute was the common law of fraud of 1872 and not the common law of fraud of 1909 (if the common law differed in the later year).  In my view, the 1909 amendment added language only to clarify what had been covered by the statute in 1872; put differently, the amendment added no new and independent basis for criminal liability.

Moreover, it seems to me still not to have been settled in 1909 that common law fraud had dropped the requirement of a pertinent scheme or misrepresentation capable of inducing reliance on the part of a reasonable person exercising ordinary prudence for the protection of his own interests.

accepted view of the statute's sweep is reasonable and far from plainly incorrect.

When a criminal statute admits more than one interpretation, the rule of lenity (among other important things, a kind of restraint on ex post facto laws) applies in favor of defendants to limit the statute's scope to the more narrow interpretation until and unless Congress speaks clearly to expand the statute.

Furthermore, even when I assume that the District Court probably erred in refusing to give an instruction involving the <u>capable</u>-of-inducing-reliance-on-the-part-of-a-reasonable-person-exercising-ordinary-prudence standard, I believe (considering the complicated nature of the scheme[4] in this case) the error was harmless.[5] Therefore, on this basis, I agree with today's Court that the leaving out of the instruction does not justify a new trial in this case.[6]

---

[4]Our panel opinion in this case made (correctly, I think) this observation about the scheme underlying this case: The "scheme was so sophisticated and complex that even the most intelligent investor would have been defeated in his quest for the truth. There was no information readily accessible in the public domain that the victims could immediately obtain to confirm or disprove the representations of the sales agents."

[5]The government concedes harmful error (if there was error) in this case. But, as a Court, we are under no obligation to accept the concessions of the government about a district court's error. It is ultimately this Court's duty to decide whether an appealed case presents reversible error and whether the court system will be put to the time, trouble, and expense of further proceedings.

[6]Beyond today's result, no doubt the Court can today say that it disapproves of language that appeared in the <u>Brown</u> opinion and in earlier opinions discussing the mail fraud standard: that is, declare that certain language incorrectly states the law of our Circuit now. No doubt the courts and judges of this Circuit should take that disapproval seriously and act accordingly as cases come before the courts and judges to which the language might seem to be applicable. I do doubt, however, the authority of today's en banc court to decide whether sets of facts not before it violate the mail fraud and similar statutes. For example, I question whether today's Court,

30

even en banc, could decide -- and, in my view, the Court does not purport to decide -- that the seller of valuable real property (1) who exaggerates the property's value to a prospective buyer, (2) but makes no other misrepresentations about the property, and (3) offers the property for sale in the context of a broad and open real estate market (which offers information about value to prospective buyers) is guilty of the crime of mail fraud or similar fraud: the case now before us en banc does not present those facts or anything close to them.

The fewer, specific objective elements required to be proved for a conviction under a criminal statute, the broader the discretion that the Executive Branch can exercise in deciding whether to prosecute a person under the statute (sometimes, the discretion comes close to prosecutional legislation). Nevertheless, I doubt that the Court intends today to say -- or can properly decide in this case -- that the pertinent statute covers and, thus, authorizes prosecutors to institute criminal proceedings based on what has traditionally been called "seller's talk," "dealer's talk," or "puffing."

31

TJOFLAT, Circuit Judge, specially concurring:

I concur in the judgment of the court but write separately because I am troubled by the court's reliance on contemporary sources to define materiality, rather than using the meaning of the word as it was understood in 1872, the year of the enactment of the mail fraud statute. It is axiomatic that, in interpreting statutes, we must interpret the words of a statute by taking the common meaning of the words at the time Congress enacted the statute. Amoco Prod. Co. v. S. Ute Indian Tribe, 526 U.S. 865, 873– 74, 119 S.Ct. 1719, 1724, 144 L. Ed. 2d 22 (1999) ("'Unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning' at the time Congress enacted the statute") (quoting Perrin v. United States, 444 U.S. 37, 42, 100 S. Ct. 311, 314, 62 L. Ed. 2d 199 (1979)). Despite this elementary canon of construction, I fear that the court has given too much significance to modern sources, and, in the process, has unduly confined district court judges in fashioning proper jury instructions.

In this regard, I believe that the court is misdirected when it defines the contours of materiality by relying on contemporary sources, such as the Restatement (Second) of Torts and Prosser and Keeton on Torts. The court attempts to justify its reliance on modern sources by suggesting that the Supreme Court relied on modern sources in defining materiality in its opinion in Neder v.

32

<u>United States</u>, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999).  I believe that this is an inaccurate characterization of <u>Neder</u>.  As I read <u>Neder</u>, the Court only cited the <u>Restatement (Second) of Torts</u> because Neder, himself, relied on it to support his argument that materiality is an element of the mail fraud statute.  Specifically, the Court cited the <u>Restatement (Second) of Torts</u> in a footnote appended to the following statement: "Neder contends that 'defraud' is just such a term, and that Congress implicitly incorporated its common-law meaning, including its requirement of materiality, into the statutes at issue."  <u>Neder</u>, 527 U.S. at 22, 119 S. Ct. at 1840.[1]  The Court's citation to the <u>Restatement (Second) of Torts</u> has limited precedential value because it was merely a regurgitation of Neder's argument.  Thus, a more straightforward reading of <u>Neder</u> suggests that the Court did not cite the <u>Restatement (Second) of Torts</u> for the proposition that the

---

[1]The full text of the footnote in <u>Neder</u> is as follows:

The Restatement instructs that a matter is material if:

> '(a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or

> '(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.' <u>Restatement (Second) of Torts</u> § 538 (1977).

<u>Neder</u>, 527 U.S. at 22 n.5, 119 S. Ct. at 1840 n.5.

33

meaning of words in a statute enacted in 1872 can be identified by reference to a modern restatement of the law.[2]

Moreover, I find it particularly instructive that the Court in Neder chose not to fashion a specific jury instruction related to materiality. Rather, the Court left it to district court judges to determine the proper formulation of jury instructions as they relate to materiality. Thus, I find it unnecessary (and bad precedent) for us to use the Restatement (Second) of Torts to define the contours of the mail fraud statute's materiality requirement.

Nonetheless, should the court feel compelled to offer guidance to district court judges regarding the materiality prong, I think it would be preferable to define materiality as it was understood at common law at the time the statute was enacted. The Court in Neder recognized as much when it cited Justice Story for the definition of materiality as it was understood in 1872. See Neder, 527 U.S. at 22–23, 119 S. Ct. at 1840 (citing Joseph Story, Commentaries on Equity Jurisprudence § 195 (10th ed. 1870), in support of the proposition that the common law could not have conceived of fraud without proof of materiality: "[i]n the first

---

[2]I find the prefatory introduction to the Restatement (Second) of Torts illustrative. In the introduction, the Restatement drafters note that the second edition of the Restatement of Torts incorporates a "reassessment of the principles, rules, and standards governing this important and dynamic branch of law." Restatement (Second) of Torts Introduction, at VII (emphasis added). Thus, the drafters recognized and acknowledged that the Restatement (Second) of Torts contains a contemporaneous summary of the changing and evolving standards of tort principles.

place, the misrepresentation must be of something material, constituting an inducement or motive to the act or omission of the other party").

Reference to Justice Story's Commentaries on Equity Jurisprudence, as opposed to the Restatement (Second) of Torts, is preferable in my view not only because it comports with the Supreme Court's opinion in Neder, but also because, as a matter of statutory interpretation, words in a statute must be interpreted as they were understood at the time of the statute's enactment. Because the Restatement (Second) of Torts provides a contemporary understanding of materiality, its application here in defining the federal mail fraud statute is of little use. Conversely, because Justice Story's Commentaries on Equity Jurisprudence was written at nearly the same time as the enactment of the mail fraud statute, that source provides a better understanding of the settled meaning of materiality under the common law as it existed in 1872.

Notwithstanding my disagreement regarding the proper definition of materiality, I agree with the court that we should overturn our prior holding in United States v. Brown, 79 F.3d 1550 (11th Cir. 1996). As such, I concur in the court's judgment.

35

BIRCH, Circuit Judge, concurring in the result:

I concur in the result only, <u>dubitante</u>. I also join Chief Judge Edmondson's concurrence.

KRAVITCH, Circuit Judge, specially concurring:

In light of the language in <u>Neder v. United States</u>, 527 U.S. 1 (1999), which was decided subsequent to our decision in <u>United States v. Brown</u>, 79 F.3d 1550 (11th Cir. 1996), I agree that <u>Brown</u> is no longer a correct interpretation of law. For this reason, I specially concur in the result of the majority's opinion overruling <u>Brown</u>.